STATESMAN SAVINGS HOLDING
CORPORATION, et al.,
Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 90–773C.

United States Court of Federal Claims.

April 22, 1998.

Order Decided April 30, 1998.

Order Denying Reconsideration
April 30, 1998.

Charles J. Cooper, Washington, DC, for plaintiff. Michael A. Carvin, Robert J. Cyn-

kar, Vincent J. Colatriano, and David H. Thompson, Cooper, Carvin & Rosenthal, of counsel.

John V. Thomas, Washington, DC, for plaintiff Federal Deposit Insurance Corporation. James J. Igo, Robert J. Soffer, Richard S. Gill, and Bruce C. Taylor, of counsel.

Jeanne E. Davidson, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. William P. Donovan, Jr., Linda Halpern, Katherine Kelly, Scott J. Pivnick, Tarek Sawi, Ho Sik Shin, and John P. Sholar, of counsel.

Melvin C. Garbow, Arnold & Porter and Jerry Stouck, Spriggs & Hollingsworth, Washington, DC, for Amicus Curie Select Committee of Certain Open Thrift Plaintiffs. Rosemary Stewart, Spriggs & Hollingsworth, for Amicus Curiae C. Hunt Trust Estate and Dennis A. Winston, Brestoff & Winston, for Amicus Curiae WestFed Holdings, Inc. Kathleen M. McGeehin, Spriggs & Hollingsworth, Washington, DC, and Beverly Ray Burlingame, Thompson & Knight, Dallas, TX, of counsel.

Gaston H. Gage, Charlotte, NC, for Amici Curiae O. Bruton and Bill Smith. Parker, Poe, Adams and Bernstein, of counsel.

*OPINION*

MILLER, Judge.

Chief Judge Smith by order entered March 3, 1998, transferred the *Statesman* case to this court.[1] At the time of the transfer, Chief Judge Smith had pending before him four pre-trial motions—Plaintiff Federal Deposit Insurance Corporation's Motion for Partial Summary Judgment Regarding Liability, Defendant's Cross–Motion for Summary Judgment, Defendant's Motion To Dismiss Certain Claims of the FDIC as Receiver, and Plaintiffs' Motion for the Direct Recovery of Monetary Relief from the United States. The first three motions had been briefed fully and argued. The fourth was only partially briefed. To expedite the transfer of this case and to allow the parties to meet their agreed-upon trial schedule,

Chief Judge Smith denied each of the motions without prejudice.

During the status conference after transfer held on March 6, 1998, the parties informed the court that decisions on these four motions prior to the commencement of trial would narrow significantly the outstanding issues and would concomitantly streamline trial and facilitate a possible settlement. The parties communicated to the court that they were amenable to rearguing the three motions argued before Chief Judge Smith and to address the direct recovery motion that had not previously been argued. Although the court appreciates the parties' willingness to assist the court further, after reviewing the briefs and the pertinent transcripts, the court is of the view that reargument is unnecessary and that the motion for direct recovery can be decided on the briefs.

**DISCUSSION**

I. *Plaintiff FDIC's motion for partial summary judgment*

The Federal Deposit Insurance Corporation ("plaintiff FDIC") asserts that as receiver for Statesman Bank for Savings, FSB, Waterloo, Iowa ("Statesman Bank"), a signatory to the contract determined by the Supreme Court to have been breached by the United States, *see United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), it is entitled to summary judgment on the issue of liability.

No facts material to a decision are disputed. The act giving rise to the breach was the legislative repudiation of the Government's commitment to the accounting treatment accorded goodwill and capital credits to induce the purchase and merger of failed thrifts constituting Statesman Bank. Plaintiff FDIC admits candidly that the *Winstar* decision finding liability technically is limited to Statesman private plaintiffs consisting of Statesman Savings Holding Corporation; American Life and Casualty Insurance Company; and The Statesman Group, Inc. ("pri-

1. Whereas the *Statesman* case was transferred, the *Statesman* file was not compiled. The court

relies on the docket sheet maintained by the Clerk of the Court to record official filings.

vate plaintiffs"),[2] but caveats that this result occurred only because the FDIC had yet to intervene in the instant dispute.[3]

Regardless of the reasons why plaintiff FDIC (or, for that matter, whatever entity was then serving as Statesman Bank's receiver) had not intervened, the success of plaintiff FDIC's motion devolves to whether it can establish that it succeeded to any claim possessed by Statesman Bank, which was a signatory to the contract that the Supreme Court determined had been breached by the Government. Consequently, the court must determine whether Statesman Bank ever owned a claim against the Government, and, if it did, what happened to that claim as Statesman Bank's assets and liabilities were transferred to various entities after its failure.

On March 11, 1988, a new savings and loan institution known as Statesman Bank was formed through the acquisition by purchase of one failed thrift in Florida and merger of three failed thrifts in Iowa. As one component of the transactions that created Statesman Bank, private plaintiffs, Statesman Bank, and the Federal Savings and Loan Insurance Corporation (the "FSLIC") entered into several agreements subsequently found by the Supreme Court to constitute a contractual relationship. Included among these agreements was an Assistance Agreement and the Federal Home Loan Bank Board (the "FHLBB") resolutions approving the purchase and merger through which the FSLIC agreed to provide Statesman Bank with certain forms of financial aid, as well as certain regulatory forbearances, by both the FSLIC and the FHLBB, the latter including the accounting treatment of goodwill and capital credits.

As a result of the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"), Statesman Bank was unable to meet its capital requirements and became insolvent. Effective July 27, 1990, the Office of Thrift Supervision (the "OTS"), successor to the FHLBB, appointed the Resolution Trust Corporation (the "RTC") as receiver for Statesman Bank. On July 26, 1990, the OTS issued a charter for a new institution known as Statesman Federal Savings Bank ("Statesman Federal") and appointed the RTC as conservator of this institution on July 27, 1990. Also on July 27, 1990, the RTC, as receiver for Statesman Bank, and Statesman Federal Bank entered into a Purchase and Assumption Agreement (the "Assumption Agreement") through which certain Statesman Bank assets and liabilities were transferred to Statesman Federal. Included in the transfer was Statesman Bank's goodwill claim. *See* Purchase and Assumption Agreement, July 27, 1990, § 3.1(*o*)(d). On February 28, 1991, the

---

**2.** The background of the purchase of one failed thrift and merger with three others that formed plaintiff Statesman Bank is set forth in *Statesman Savings Holding Corp. v. United States*, 26 Cl.Ct. 904, 907–09 (1992), *aff'd sub nom. Winstar v. United States*, 64 F.3d 1531 (Fed.Cir.1995) (en banc), *aff'd, United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

**3.** The proper role of the FDIC in this dispute is particularly important to each of the motions currently before the court. This case was filed on August 15, 1990. Upon receiving the FDIC's motions to intervene and to substitute itself as plaintiff, which were filed during fall 1996 in many of the *Winstar*-related cases pending before the Court of Federal Claims, and recognizing the importance of determining the proper role for the FDIC, Chief Judge Smith referred the matter to Judge Turner for resolution. After Judge Turner heard oral argument in January 1997, he issued what he characterized as a "tentative" bench ruling that could be superceded by a forth-coming written opinion. Transcript of Proceedings, *Winstar Corp. et al v. United States*, Nos. 90–8C et al., at 203, 216 (Fed.Cl. Jan. 30, 1997) (hereinafter "Tr."). On March 14, 1997, Judge Turner issued an order that governed 43 cases granting the motion to intervene and denying the motion to substitute, with an opinion to follow explaining his reasoning. On June 26, 1997, Chief Judge Smith entered an order in this case that granted the FDIC intervenor status allowing any party to move for reconsideration upon issuance of Judge Turner's written opinion.

The court has endeavored to work within the framework of Judge Turner's tentative ruling and order. In his bench ruling, Judge Turner allowed the FDIC to intervene "as the legal owner of the claims that the thrift held," Tr. at 207, but not to substitute itself for private plaintiffs. Private plaintiffs, holding a "direct economic interest" as shareholders, would have standing to assert their right to any "surplus" in the situation where the thrift is in receivership. Tr. at 208, 209, 212, 213.

RTC became receiver for Statesman Federal. Subsequently, on March 1, 1991, the RTC, acting in its receivership capacity, transferred the assets of Statesman Federal to the RTC in its corporate capacity. This transfer also included the right to pursue Statesman Bank's goodwill claim. *See* Contract of Sale, Mar. 1, 1991, § 2.1(a).

The RTC's sunset provisions took effect on December 31, 1995, and the RTC was extinguished as of that date. The FDIC in its corporate capacity succeeded by operation of law to the assets held by the RTC. Any assets held by the RTC in its corporate capacity were transferred to the FSLIC Resolution Fund (the "FRF"), which is managed by the FDIC, acting in its corporate capacity. *See* 12 U.S.C.A. § 1441a(m)(2) (West Supp. 1998).

Thus, in the case at bar, plaintiff FDIC takes the position that it succeeded to the claim owned by Statesman Bank in either of two possible manners. If the transfer from RTC-receiver to RTC-corporate was valid, as plaintiff FDIC maintains, then the FDIC owns the claim because RTC-corporate's assets subsequently were transferred to the FRF. Alternatively, if the claim remained with the RTC as receiver, the claim was also transferred to the FDIC—in this instance to the receivership arm of the FDIC. In either case the FDIC now purports to own the claim.

Defendant concedes that Statesman Bank was a signatory to the contract found by the Supreme Court to have been breached and that in theory plaintiff FDIC, as receiver, can pursue Statesman Bank's claims. However, defendant raises two arguments in support of its cross-motion for summary judgment that it insists compel the dismissal in its entirety of plaintiff FDIC's complaint. The first is that the doctrine of accord and

satisfaction operates to bar plaintiff FDIC's claim. Second, defendant argues that Statesman Federal acquired the assets of Statesman Bank on an "as-is" basis. Because any claim based on the assets of Statesman Bank—including the goodwill claim—traveled through this transaction, plaintiff FDIC's goodwill claim is foreclosed.

### 1. *Accord and satisfaction*

■ The United States Court of Claims, predecessor to the Federal Circuit, has provided a five-part test applicable to an accord and satisfaction:

> "The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration. And its most common pattern is a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute."

*Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 59, 343 F.2d 951, 955 (1965) (quoting *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir.1949)).

The factual underpinnings of the alleged accord and satisfaction surround a November 1991 agreement whereby the RTC—acting as receiver—entered into an agreement with the FRF to discontinue the Statesman Assistance Agreement. The substance of this agreement was that the FRF would provide the receiver with a lump-sum payment in the amount of $28,745,733.00, which would end the FRF's obligations under the Assistance Agreement.[4] The Termination of FSLIC Assistance Agreement (the "Termination Agreement"), was approved on November 5, 1991, and executed on November 21, 1991.[5]

---

4. Pursuant to the Assistance Agreement, the FRF was required to provide, among other forms of assistance, yield maintenance, capital loss coverage, and certain forms of indemnification.

5. *Amici* Caroline Hunt Trust Estate and WestFed Holdings, Inc., describe the "many 'hats' " of the FDIC:

> The plaintiff-intervenor FDIC–R is the legal successor to the RTC for purposes of the prior "settlements" of Assistance Agreements dis-

cussed herein. Another FDIC—the FDIC as manager of the FSLIC Resolution Fund ("FRF")—was the "other party" to the settlements of certain Assistance Agreements for closed thrifts, including Statesman Bank. That FDIC, as manager of the FRF, paid cash to RTC (whose successor is FDIC–R) to settle the Assistance Agreements of certain closed thrifts.

*Amici Curiae* Br. filed Feb. 3, 1998, at 5 n. 7.

As evidence that the Termination Agreement constitutes an accord and satisfaction of any and all claims arising out of the Assistance Agreement, defendant points to the language of the RTC's approval resolution, dated November 5, 1991, which states, in pertinent part:

WHEREAS, staff recommends terminating the Statesman Assistance Agreement pursuant to the authority of Title V of FIRREA, in accordance with the Program and by allowing the RTC as receiver to accept $28,575,404 plus interest estimated at $4,119 per day from October 8, 1991 until funds are transferred, in exchange for the early termination and satisfaction of the FSLIC Assistance Agreement; and

. . . .

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors of the RTC approves the early termination and satisfaction of the Statesman Assistance Agreement as set forth above, and directs and authorizes all appropriate staff to take all actions necessary to accomplish such termination.

Defendant takes the position that the Termination Agreement meets each of the requirements for a valid accord and satisfaction and that the receiver failed to reserve expressly any claims whatsoever. *See Cannon Constr. Co. v. United States,* 162 Ct.Cl. 94, 101, 319 F.2d 173, 177 (1963) (requiring "manifest and explicit" reservation). Because the Assistance Agreement is the sole source of plaintiff FDIC's goodwill claim, defendant claims entitlement to summary judgment.

When determining the scope of an accord and satisfaction, the court is required to examine the parties' conduct for evidence of intent. *See Fraass Surgical Mfg. Co. v. United States,* 205 Ct.Cl. 585, 594–95, 505 F.2d 707, 712 (1974). Plaintiff FDIC has detailed a sequence of events demonstrating that neither the receiver nor the FRF intended that the $28 million payment was intended to settle the goodwill claims. Plaintiff FDIC emphasizes that the Termination Agreement addressed expressly each item that it considered and that it did not mention goodwill. According to plaintiff FDIC, the

degree of detail evident in the agreement indicates that the absence of a reference to goodwill signifies that the parties could not have intended to bargain away such a claim.

Plaintiff FDIC also relies on the affidavit of Ross Dierdorff, Senior Financial Analyst, Division of Research and Statistics, FDIC. Mr. Dierdorff avers that the FDIC never considered potential goodwill claims when it implemented the policy that lead to the relevant Termination Agreement, Affidavit of Ross Dierdorff, Nov. 13, 1997, ¶ 6, and that the specific Statesman Termination Agreement did not take into account the value of potential goodwill claims. *Id.* ¶ 10. Based on Mr. Dierdorff's statements, plaintiff FDIC contends that no meeting of the minds occurred with respect to goodwill claims and thus no accord and satisfaction.

Defendant takes issue with Mr. Dierdorff's affidavit on the ground that the Termination Agreement is unambiguous and that the court therefore should not accept extrinsic evidence such as Mr. Dierdorf's affidavit. *See City of Tacoma v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) (stating that "[o]utside evidence may not be brought in to create an ambiguity where the language is clear."). As an initial point, the court does not find the Termination Agreement to be devoid of ambiguity, in that to understand the agreement—and the scope of the alleged accord and satisfaction—the court must understand the context in which it was entered. *See Fraass,* 205 Ct.Cl. at 594–95, 505 F.2d at 712 (requiring court to examine circumstances under which settlement was reached). The court will consider Mr. Dierdorff's affidavit as providing useful evidence concerning whether there was a meeting of the minds with respect to settling goodwill claims.

Plaintiff FDIC also relies on *Westerhold v. United States,* 28 Fed. Cl. 172 (1993), and *Brock & Blevins,* 170 Ct.Cl. at 52, 343 F.2d at 951, to support the proposition that an accord and satisfaction only reaches specific claims that are addressed in the final agreement. The agreement in *Westerhold* concerned an equitable adjustment for a contract to construct certain walkways. The

parties signed a modification—and the contractor did not reserve any claims—granting the contractor additional compensation to include longitudinal camber. The contractor later brought a suit seeking damages for the delay caused by having to construct the walkways with camber. The court concluded that the modification did not constitute an accord and satisfaction with respect to delay damages resulting from the obligation to install camber. The court reasoned that because the modification did not address delay damages, it could not have contemplated settling such a claim. The court noted that the parties continued to negotiate the issue of delay costs after signing the modification and determined that this behavior was evidence that the modification did not resolve all camber-related issues.

The situation at issue in *Brock & Blevins* easily is distinguishable from that in *Westerhold.* The contractor entered into a bilateral modification addressing overtime and overhead costs. After receiving an equitable adjustment, the contractor initiated a suit seeking damages based on claims related to overtime and overhead. The court ruled that the modification constituted an accord and satisfaction for claims relating to overtime and overhead.

Plaintiff FDIC postulates that the instant dispute is analogous to *Westerhold* and distinguishable from *Brock & Blevins.* In order to reach the same conclusion as that drawn by plaintiff FDIC, the court must understand the context under which the Termination Agreement was reached. The court has been aided immensely in this undertaking by an *amicus curiae* brief (the "*amicus* brief") submitted in opposition to defendant's cross-motion by the Select Committee of Certain Open Thrift Plaintiffs.

Specifically, the *amicus* brief analyzes defendant's argument that the termination of the Assistance Agreement ended all of the Government's contractual obligations, including those related to goodwill. *See* Def's Br. filed Oct. 14, 1997, at 15 ("[T]he settlement of the Assistance Agreement served as a full accord and satisfaction of *all* claims between Statesman Bank and the Government."). Subsumed within this line of reasoning is the

corollary assumption that, absent a valid Assistance Agreement, the other documents on which the Court of Federal Claims, the Federal Circuit, and the Supreme Court relied to find a contractual relationship are without effect.

Chief Judge Smith already has addressed these questions and resolved them in favor of plaintiffs. *See California Federal Bank v. United States,* 39 Fed.Cl. 753 (1997) (opinion resolving common issues on summary judgment) ("*CalFed*"). In addressing Common Issue No. 2, Chief Judge Smith determined that the termination of assistance agreements did not affect the Government's obligation to honor its promises respecting the accounting treatment of goodwill. *See* 39 Fed.Cl. at 764. In reaching this conclusion, the court relied on both the Federal Circuit's *en banc* decision, *Winstar Corp. v. United States,* 64 F.3d 1531 (Fed.Cir.1995) (*en banc*), and the Supreme Court's affirmance of that decision, *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Specifically, the court stated that the "expiration provisions [of the assistance agreements] applied only to the 'executory provisions set out in the SAA [Supervisory Action Agreement]....'" *CalFed,* 39 Fed. Cl. at 762 (quoting *Winstar,* 64 F.3d at 1542).

The prior decisions discussing the termination of assistance agreements distinguish between two discrete aspects to the promises made by the Government: 1) regulatory forebearances, including the ability to amortize supervisory goodwill over a period of years; and 2) executory promises through which the Government obligated itself to provide certain forms of financial assistance to the financial institutions. Because the two types of promises are separate, as persuasively argued by the *amicus,* the termination of one does not necessarily affect the existence of the other. As the Federal Circuit made clear:

> [T]he expiration provision [of the Supervisory Action Agreement] as only relating to executory provisions set out in the SAA, which obligated the FSLIC to make certain payments to the merged thrift for a limited period of time. This provision of the SAA in any event does not negate

other obligations under the merger plan, including the specific time periods for amortization of goodwill.

64 F.3d at 1542.

Admittedly, the above-quoted language was taken from that portion of the Federal Circuit opinion addressing Glendale Federal Bank's breach claim. Chief Judge Smith applied the same language in his opinion addressing Common Issue No. 2 and noted that the termination clause language at issue in that opinion was identical to that involved in the cases of *Statesman, Winstar,* and *C. Robert Suess,* No. 90–981C. *CalFed,* 39 Fed. Cl. at 762. The court is also aware that both the Federal Circuit and Chief Judge Smith were considering the natural expiration of the assistance agreements, as opposed to the early termination that occurred in the case at bar. However, the decisional premise applied by both Chief Judge Smith and the Federal Circuit leads to an identical result in this case.

Although not necessary to resolve the pending summary judgment motions, the court addresses defendant's implicit argument that documents other than the Assistance Agreement are devoid of contractual effect absent a valid Assistance Agreement. This issue has also been resolved in favor of other plaintiffs. *See CalFed,* 39 Fed.Cl. at 772–76 (Common Issue No. 9). Resolution of this issue in favor of plaintiff FDIC in this case is consistent with the law of the case. In finding liability in favor of the Glendale plaintiffs, the Federal Circuit rejected the Government's argument that "the FSLIC's SAA with Glendale is the only document evidencing Glendale's contract with the FSLIC and that it contains no promise relating to goodwill or its amortization." *Winstar,* 64 F.3d at 1540. Instead, the Federal Circuit ruled that "all of the contemporaneous documents, which under the integration clause of the SAA collectively constituted the 'Agreement' of the parties, that the Bank Board and the FSLIC were contractually

bound to recognize the supervisory goodwill and the amortization periods reflected in the approved accountant's letter." *Id.* at 1541–42. The Supreme Court affirmed this conclusion. *See* 518 U.S. at 862–64, 116 S.Ct. at 2449.[6] Thus, the court finds that even if the Assistance Agreement were terminated, plaintiff FDIC, standing in the shoes of Statesman Bank, would possess a viable goodwill claim.

In addition to the previous decisions finding two discrete types of promise, the factual underpinnings of the FDIC's program to terminate outstanding assistance agreements militates against a finding of a global accord and satisfaction. FIRREA rescinded the ability of certain financial institutions to apply supervisory goodwill toward their capital requirements, which led to the seizure of some institutions by federal regulators. Statesman Bank was such an institution. What FIRREA did not accomplish was the discharge of financial obligations owed by the FDIC to several financial institutions pursuant to assistance agreements. These continuing obligations were both extremely costly and difficult to administer.

Recognizing this verity, the FDIC developed a plan by which it sought to enter into termination agreements that would settle its outstanding financial obligations to assisted thrifts. *See, e.g.,* FDIC Mem., Sept. 14, 1990 (discussing the pros and cons of terminating various assistance agreements and recommending the termination of assistance agreements with thrifts placed into receivership). The FDIC determined that it would negotiate a one-time lump-sum payment that would obviate the need to continue to subsidize certain assisted thrifts. Such a result would effect significant savings from both a monetary and administrative standpoint. *See, e.g.,* RTC Rept. to the Oversight Board of the RTC and the Congress, Sept. 18, 1990, Vol. I, p. 10 (stating that termination of assistance agreements will provide several means of

---

**6.** Defendant's citation to page 2451 of the *Winstar* opinion as holding that the Assistance Agreement was "the basis of the breach of contract in this case," Def's Br. filed Dec. 11, 1997, at 5, is not at variance with the Supreme Court's holding that the relevant documents forging a con-

tract included FHLBB/FSLIC resolutions and letters. However, defendant's conclusion that "without the Assistance Agreement, there can be no breach of contract claim," *id.,* is not a valid implication of that holding.

achieving cost savings); RTC Rept. to the Oversight Board of the RTC and the Congress, Sept. 18, 1990, Vol. II, at III–II (stating that termination of assistance agreements would "eliminate administrative costs to both parties").

The November 1991 termination of the Statesman Bank Assistance Agreement was a direct result of the FDIC's policy. A careful review of the documentation underlying the Statesman Termination Agreement reveals that the parties contemplated discharging only the FDIC's executory payment obligations. For example, the RTC Memorandum of November 1, 1991 proposing termination of the Statesman Assistance Agreement states that "[o]n March 11, 1988, FSLIC entered into a five year Assistance Agreement with Statesman that provides 93% capital loss coverage, yield subsidy, and indemnification for undisclosed liabilities, unreserved for claims and pursuit of related claims." Select Comm.'s *Amicus* Br. filed Feb. 3, 1998, App. G at 1.

The worksheet accompanying the memorandum illustrates the manner in which the approximately $28 million payment was calculated. The figures represented are correlated to the FDIC's executory payments. No evidence is present that the termination contemplated settling any obligations other than the continuing executory payments due under the Assistance Agreement.[7]

Because defendant failed to put forth credible evidence indicating that the parties intended to effectuate a global release, the court finds that defendant has not met its burden of establishing an accord and satisfaction that would bar plaintiff FDIC, as receiver, from bringing claims on behalf of Statesman Bank. In *Massachusetts Bay Transportation Authority v. United States*, 129 F.3d 1226, 1236 (Fed.Cir.1997), the Federal Circuit cited with approval the requirements for a valid accord and satisfaction articulated in *Brock & Blevins*, 170 Ct.Cl. at 59, 343 F.2d at 955, that demand a meeting of the minds and consideration. The circumstances under which the Termination Agreement was entered into do not support a meeting of the minds on the issue of resolving goodwill claims. Moreover, the evidence does not support a finding that the $28 million payment took into account goodwill-related claims.

### 2. The "as-is" clause

■ The second ground of defendant's cross-motion for summary judgment is directed toward a specific component of plaintiff FDIC's claim[8] that can be characterized as the receivership deficit. Recouping the receivership deficit is one element of plaintiff FDIC's claim.[9] When a bank is placed into receivership, the receiver has a duty to collect all of the bank's assets and satisfy the bank's creditors. The priority scheme by which the receiver satisfies creditors is determined by statute. *See* 12 U.S.C. § 1821(d)(11)(A) (1994). For example, level 1 claims are paid before level 2 claims. When the receiver is unable to pay each of the creditors at a particular level in full, it either pays them a *pro rata* share or—if no funds are available—nothing at all. In the case at bar, the receivership was unable to satisfy all of Statesman Bank's creditors and

---

7. The court examined a release agreement signed by Metropolitan Federal Bank. Although the context in which the agreement was entered into was not provided to the court, the agreement is much broader in scope than the Termination Agreement at issue in the case at bar. For example, the Metropolitan release mentions expressly several agencies in addition to the FRF, including OTS, the FSLIC, and the FHLBB. The Metropolitan document also releases the Government from all claims related to the breach of 1985 and 1988 agreements and forebearances.

8. The exact nature of plaintiff FDIC's claim is particularly relevant to defendant's Motion To Dismiss *Certain Claims of the FDIC as Receiver*,

and part II of this opinion will discuss it in greater detail.

The court understands that plaintiff FDIC characterizes its claim as unitary in nature. In other words, plaintiff FDIC would have the court award damages from a point starting at the level of the receivership deficit and proceed upward. For example, if the deficit is $70 million and the court were to find that all plaintiffs are entitled to $100 million in lost profits, plaintiff FDIC would have the court award a total of $170 million.

9. The other element of plaintiff FDIC's claim is any expectancy damages to which Statesman Bank might be entitled.

ran a deficit. Plaintiff FDIC postulates that, once an entity is placed into receivership, it is a foregone conclusion that its assets will decline in value. Plaintiff FDIC also maintains that this decline in value is directly attributable to defendant's breach of its contractual agreements.

Defendant asserts that Statesman Federal acquired the assets of Statesman Bank on an "as-is" basis. As to this basic contention, defendant is correct. However, defendant imputes a broad meaning to the "as-is" provision of the relevant Purchase and Assumption Agreement dated July 27, 1990. Defendant would have the court accept a reading of the "as-is" clause that would preclude plaintiff FDIC from recovering the lost value of the Statesman Bank assets. In support of this contention, defendant cites several cases to support its reading of the Purchase and Assumption Agreement. *See, e.g., Rochester Iron & Metal Co. v. United States,* 168 Ct.Cl. 422, 427, 339 F.2d 640, 643 (1964) (as-is clause places risk of loss on buyer); *M. Samuel & Sons v. United States,* 61 Ct.Cl. 373, 381–82 (1925) (same). Defendant also notes that, when Statesman Federal purchased the assets of Statesman Bank, it recorded the book value of the newly acquired assets as opposed to their actual value, which evidently was significantly less.

The court rejects defendant's argument as reading too much into the as-is clause of the Purchase and Assumption Agreement. The rationale for including such a clause was to protect the seller, RTC as receiver for Statesman Bank, from liability resulting from the difference between the value of the assets when liquidated and their book value. Although the case law offers no guidance, the

clause, read for what it imports, was not intended to foreclose the receiver from recovering damages based on the conduct of a third party—here the Government—that caused the devaluation of the assets. Plaintiff FDIC provides a useful illustration of this point. If one of the loans acquired by Statesman Federal was worth less than its book value, plaintiff FDIC—as successor in interest to Statesman Federal—could not seek a remedy against the entity that sold the loan. However, in the case at bar, plaintiff FDIC is seeking to recover via a claim attached to one of the assets that it purchased, namely the ability to amortize goodwill over a set period of time.

Defendant has failed to raise a meritorious challenge to plaintiff FDIC's assertion that it is the proper successor in interest to the claims of Statesman Bank. Defendant has also failed to meet its burden on either of the grounds supporting its cross-motion. Plaintiff FDIC's pretrial motion for summary judgment on liability is granted, only insofar as the FDIC is asserting the claim of Statesman Bank, and defendant's cross-motion is denied.[10]

## II. *Defendant's Motion To Dismiss Certain Claims of the FDIC as Receiver*

■ Before addressing the merits of defendant's motion, the court must discern the nature of plaintiff FDIC's claim. Defendant maintains that plaintiff FDIC is asserting two distinct claims: 1) as successor to the rights of Statesman Bank, plaintiff FDIC is entitled to bring any claims that could have been brought by Statesman Bank itself; and 2) the so-called receivership deficit.[11] Although defendant disputes the merits of the first component of plaintiff FDIC's claim, no

**10.** Plaintiff FDIC's Complaint does not appear in the official docket, but is date-stamped "Received on December 31, 1996"; the docket sheet records that a "Supplemental Complaint" was filed by leave on June 26, 1997. The latter is identical. Although plaintiff FDIC's motion is couched modestly to succeed to Statesman Bank's breach of contract claim as defined by the Supreme Court in *Winstar,* which is the breach claim asserted on its own behalf, plaintiff FDIC actually is seeking damages in both its receivership and corporate capacities. Plaintiff FDIC has asked the court to assess against defendant the costs associated with filing its summary judgment motion, which the court has granted with respect to the FDIC's receivership claim. The court does

not view defendant's refusal to concede liability as being unreasonable, given that plaintiff FDIC also asserts entitlement in its corporate capacity to judgment for the so-called receivership deficit.

**11.** *See supra* note 8. The receivership deficit arose when, after collecting all of Statesman Bank's assets, the receivership lacked sufficient funds to satisfy all of Statesman Bank's creditors. Specifically, the receivership was unable to pay all of Statesman Bank's depositors. The FRF therefore was required to step in and make the depositors whole, which implicated a payment of approximately $30 million. That $30 million payment, plus accrued interest, constitutes approximately 99% of the receivership deficit.

dispute exists—as between plaintiff FDIC and defendant—that plaintiff FDIC is the proper party to initiate such a claim. However, defendant does challenge plaintiff FDIC's capacity to carry forward the second element of its claim. According to defendant, the receivership deficit claim is not properly before the court and should be dismissed for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(4). In the alternative defendant has moved to dismiss the receivership deficit claim for lack of subject matter jurisdiction and as barred by the statute of limitations pursuant to RCFC 12(b)(1).

Not surprisingly, plaintiff FDIC—recognizing the strength of defendant's motion if the court were to accept defendant's two-prong characterization of its claim—describes the claim as being unitary in nature and asserts that it only seeks all of the damages suffered by Statesman Bank. Plaintiff FDIC maintains that the entirety of damages suffered by Statesman Bank includes "(1) the full value Statesman Bank would have if it were open and operating today, i.e., the value it would have had absent the breach and (2) the value actually recovered when Statesman Bank was liquidated." Plf FDIC's Br. filed Nov. 14, 1997, at 18. The key feature of this claim is that the value of Statesman Bank when liquidated encompasses the receivership deficit. As plaintiff FDIC explains:

> [T]he amount owed to creditors is not a separate damage claim being asserted in this case, but, rather, the FDIC is suing for the total damages suffered by Statesman Bank. The Receivership deficit is simply a short[-]hand way of summarizing one of the components of Statesman Bank's lost profit/lost equity value measure of damages.

Id. at 26.[12]

1. *Failure to state claim upon which relief may be granted*

In evaluating a motion to dismiss for failure to state a claim under RCFC 12(b)(4),

the facts alleged in the complaint are construed in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). If no set of facts exists that would entitle plaintiff FDIC to relief, the claim should be dismissed. *Mostowy v. United States*, 966 F.2d 668, 672 (Fed.Cir.1992).

Evaluation of defendant's motion to dismiss requires that the court respect scrupulously the different components of the FDIC. When the OTS appointed the RTC as receiver for Statesman Bank, effective July 27, 1990, the RTC acted pursuant to 12 U.S.C. § 1821(d)(2)(A)(i) (1994), which grants the receiver

> all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, account holder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution . . . .

Thus, the RTC stepped " 'in the shoes' " of Statesman Bank. *See Waterview Management Co. v. FDIC*, 105 F.3d 696, 701 (D.C.Cir.1997) (quoting *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994)). The court must be careful to prevent plaintiff FDIC from "succeed[ing] to an interest greater than that held by the failed institution." *Id.* Plaintiff FDIC as successor in interest to the RTC—the original receiver for Statesman Bank—has no rights beyond those obtained by the RTC. It therefore is beyond serious dispute that any rights possessed by plaintiff FDIC are limited to those held by Statesman Bank. Moreover, the fact that plaintiff FDIC is now acting as receiver for Statesman Bank does not expand its rights. *See O'Melveny*, 512 U.S. at 86, 114 S.Ct. at 2054; *Texas Am. Bancshares, Inc. v. Clarke*, 954 F.2d 329, 339 (5th Cir.1992); *Leach v. FDIC*, 860 F.2d 1266, 1269 (5th Cir.1988). Neither the FDIC nor defendant disputes this axiomatic fact.

Having established that the FDIC only can assert those claims that could have been

---

12. The court understands that plaintiff FDIC would not apply any recovery of the receivership deficit outside the priority distribution scheme and would instead include such damages in the total measure of expectancy damages, all of which would flow through the receivership in accordance with the priority distribution scheme. It is in this manner that plaintiff FDIC maintains the unitary nature of the claim.

asserted by Statesman Bank, the court must determine whether that portion of the claim brought by plaintiff FDIC seeking the lost value of Statesman Bank's assets is within the scope of the FDIC's mandate. It is not. The task of a liquidation receiver, whether the RTC, the FDIC, or a private individual, is to collect assets and satisfy creditors. In the case at bar, Congress has provided that the receiver is to "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution." 12 U.S.C. § 1821(d)(2)(E). Any assets garnered by the receiver are to be disposed of in a specified manner. *See* 12 U.S.C. § 1821(d)(11)(A). If every creditor is not repaid fully, or even partially, the receiver is not responsible. In fact, by creating a priority scheme of distribution, Congress anticipated such a result. When creditors are not paid in full, or at all, the receiver is not responsible for the shortfall, so long as it has complied with its duties to maximize the amount of assets recovered.

By seeking to recover the receivership deficit, plaintiff FDIC is attempting to exceed its statutory mandate by fusing its different branches. Plaintiff FDIC's zeal is understandable when one considers that 99% of the receivership deficit is owed to the FRF, which is managed by the FDIC in its corporate capacity.[13] However, the fact that FDIC-corporate, as manager of the FRF, is the primary creditor of the Statesman Bank receivership does not expand the receiver's powers. "[A] receiver or like surrogate cannot pursue claims that belong, not to the receivership estate as such, but rather to those who may have an ultimate derivative interest in the estate." *Scholes v. Schroeder*, 744 F.Supp. 1419, 1422 (N.D.Ill.1990).[14] Refusing to allow the FDIC to combine its powers is consistent with the fact that the

FDIC fervently raises the issue of its separate branches when doing so is advantageous. *See, e.g., FDIC v. Rahn*, 116 F.3d 1142, 1145–46 (6th Cir.1997) (holding that FDIC-corporate cannot be held liable for claims residing with FDIC-receiver); *see also Texas Am. Bancshares*, 954 F.2d at 335 (distinguishing between FDIC's receivership and corporate capacities).

Irrespective of the manner in which plaintiff FDIC attempts to characterize the nature of the damages sought, it cannot avoid the fact that the FRF is the entity that has been harmed. Because any damage suffered as a result of the receivership deficit has been suffered by the FRF, not Statesman Bank, this element of plaintiff FDIC's claim must be dismissed. *See Valley Forge Christian College v. Americans United*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982) (requiring that litigant itself has suffered an actual injury). Because the circumstances of the instant case are typical in that the FRF is the primary creditor of the failed institution, much of the damages flowing into the receivership will satisfy the subrogated claims held by the FRF. Those claims, along with those of the other creditors, are to be satisfied from the assets of Statesman Bank, one of which is the goodwill claim. However, plaintiff FDIC is limited by the bounds of its statute and is not permitted to seek to satisfy Statesman Bank's creditors by recovering for what was in effect a consequence of RTC's insurance activities.

The situation presented by the case at bar—with the FRF, and ultimately the United States, as the receivership's primary creditor—militates against a ruling in favor of the FDIC for another reason.[15] If plaintiff FDIC were permitted to carry this claim forward, the court would be deciding a nonjusticiable intra-governmental dispute. *See Juliano v. FADA*, 736 F.Supp. 348, 352

---

**13.** If the FRF is unable to fulfill its mission, the United States Treasury will fund any deficit. *See* 12 U.S.C. § 1821a(c)(1). Any FRF surplus will also return to the United States Treasury. *See* 12 U.S.C. § 1821a(f).

**14.** In support of this proposition, the court relied on *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 429–34, 92 S.Ct. 1678, 1685–88, 32 L.Ed.2d 195 (1972). *Caplin* involved a bankruptcy trustee. Bankruptcy trustees have broader powers than receivers in that the former can

represent creditors (at least with respect to the bankrupt entity's assets), so if a bankruptcy trustee cannot pursue such claims, the restrictions should apply to a receiver.

**15.** The court has accepted the parties' representations that 99% of the so-called receivership deficit is owed to the FRF and that the remaining 1% is owed to other private creditors of Statesman Bank. With respect to any deficit owed to private non-governmental creditors of Statesman Bank, the following analysis does not apply. Ac-

(D.D.C.1990), *aff'd*, 959 F.2d 1101 (D.C.Cir. 1992) (Table). In its capacity as manager of the FRF, the FDIC is considered an agency of the United States. *See Lawson v. FDIC*, 3 F.3d 11, 13 (1st Cir.1993).[16] If the receivership deficit claim were allowed, the result would be a federal agency, FDIC-corporate, litigating against the United States Department of Justice with the goal of causing a large portion of any damages recovered to be transferred from one Treasury account an-other.[17] Such a result would be nonsensical in that the United States Treasury has already provided the FRF with the funds used to make depositors of failed thrifts whole, is required to fund any FRF deficit, and will be the beneficiary of any FRF surplus. *See supra* note 13.

Plaintiff FDIC's claim for the so-called receivership deficit is subject to dismissal for failure to state a claim upon which relief may be granted.[18]

### 2. Lack of subject matter jurisdiction and failure to comply with the applicable statute of limitations

The jurisdiction of the Court of Federal Claims extends to "any claim against the

---

cordingly, were the receivership deficit aspect of the claim to have been dismissed on the merits as a nonjusticiable intra-governmental dispute, plaintiff FDIC would have been permitted to prosecute the claim to the extent of the deficit owed to private creditors.

16. In *FDIC v. Thompson & Knight*, 816 F.Supp. 1123 (N.D.Tex.1993), *aff'd*, 26 F.3d 1119 (5th Cir.1994) (Table), the district court ruled that the FDIC was strictly limited by the manner in which brought a suit. The facts of *Thompson & Knight* are similar to those of the case at bar. The FHLBB declared a Texas thrift insolvent and appointed the FSLIC receiver. The FSLIC subsequently entered into an agreement with a second financial institution whereby the majority of the failed thrift's assets were transferred to the latter. Included in this transfer were all of the assets that were the subject of the subsequent lawsuit—this fact is inapposite to the case at bar. At the same time, FSLIC-corporate entered into an assistance agreement with the second financial institution. The remaining assets of the failed thrift were transferred to the FSLIC in its corporate capacity.

Upon enactment of FIRREA, the assets held by FSLIC-corporate—including those of the failed thrift—were transferred to the FRF. As an assignee of the original receiver, FDIC-corporate initiated a suit, as manager of the FRF and as assignee of the receiver, to recover $50 million in damages allegedly incurred by the failed institution. The court granted summary judgment in favor of defendants. Subsumed within its decision was a ruling that the FDIC could not bring suit in all of its capacities. Instead, the FDIC was limited to the rights that it obtained as assignee of the receiver. Even though FDIC-corporate had incurred losses by virtue of having to make assistance payments, those losses were not recoverable directly in the pending action.

17. In reality plaintiff FDIC is seeking the proverbial two bites at the apple to make the FRF whole. One is through recovery of the receivership deficit; the second, by challenging private plaintiffs' claim for direct recovery, as discussed in part III of this opinion. If the court denies private plaintiffs' motion for direct recovery and if it awards expectancy damages, any such damages will flow through the receivership. The priority system requires that after satisfying administrative expenses, any expectancy damages recovered will be distributed to creditors of the receivership. The FRF is by far the largest such creditor.

Private plaintiffs point out the financial incest between FDIC-corporate and the Department of Justice:

> In at least one respect, the FDIC's potential conflict of interest has arguably been exacerbated since the time of Judge Turner's decision. Section 632 of the recently-enacted Treasury and General Government Appropriations Act authorizes the Secretary of the Treasury to use up to $33.7 million from the FRF to reimburse the Department of Justice for the "reasonable expense" of litigating the government's defense of *Winstar*-related cases. Thus, the fund for which the FDIC is manager and which will be the initial beneficiary of any judgment obtained by the FDIC is paying for the government's defense of these cases....

Plfs' Br. filed Nov. 14, 1997, at 8 n. 6. This court shares private plaintiffs' dismay at the hydra-headed governmental roles that Congress created for the FDIC and the United States Treasury. Defendant reasonably suggests avoiding this situation by dismissing plaintiff FDIC's receivership deficit claim, which FDIC-corporate will recoup as a priority creditor from any award on FDIC-receiver's claim for expectancy damages. This is the lawful manner by which to make the FRF whole.

18. In a footnote to its motion to dismiss, defendant raises the possibility that the transfer of Statesman Bank's claims to various entities, ultimately FDIC-corporate, was accomplished in violation of the Assignment of Claims Act, 31 U.S.C. § 3727 (1994). This argument is without merit. *See Seaboard Air Line Ry. v. United States*, 256 U.S. 655, 657, 41 S.Ct. 611, 612, 65 L.Ed. 1149 (1921) (stating that assignments to receivers are beyond ambit of statute).

United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department ... for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (1994). Although the court is to construe favorably to the pleader the allegations raised in the complaint, *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. at 1686, and will accept as true any facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988), the burden is on plaintiff FDIC to establish jurisdiction. *See id.* at 748.

■ In the instant case, plaintiff FDIC seeks damages for breach of contract. The Tucker Act, 28 U.S.C. § 1491(a), waives sovereign immunity only in respect of an express or implied-in-fact contract with the United States. However, Statesman Bank, not plaintiff FDIC, was the signatory to the contract found by the Supreme Court to have been breached. Plaintiff FDIC was permitted to intervene in the *Winstar*-related cases as receiver for Statesman Bank and therefore appears before the court in the shoes of Statesman Bank. *See O'Melveny*, 512 U.S. at 86, 114 S.Ct. at 2054. Plaintiff FDIC lacks privity with the United States for a claim brought in its corporate capacity. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550–51 (Fed.Cir.1983). Because the court has determined that the receivership deficit is not a component of the damages suffered by Statesman Bank, plaintiff FDIC cannot adduce any facts that establish an express or implied-in-fact contract with the United States regarding plaintiff FDIC's receivership deficit claim.

■ The statute of limitations is jurisdictional in the Court of Federal Claims. *See Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271–72, 1 L.Ed.2d 306 (1957); *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1572 (Fed.Cir.1994). Absent a contrary statutory provision, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). A claim against the United States Government accrues "when all the

events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." *Japanese War Notes Claimants Assoc. v. United States*, 178 Ct.Cl. 630, 632, 373 F.2d 356, 358 (1967).

■ Judge Wiese determined that the breach in the *Winstar*-related cases occurred on December 7, 1989, the date on which the OTS' implementing regulations became effective. *See Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed.Cl. 174, 191 (1997). *aff'd sub nom. Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874 (Fed.Cir.1998). Plaintiff FDIC did not file its claim until December 31, 1996. Although filed after the statute of limitations had expired, plaintiff FDIC's claim is not necessarily time-barred.

On September 29, 1995, the RTC and the Department of Justice entered into a revised tolling agreement that stated, in pertinent part:

1. The running of the statute of limitations for all Goodwill Claims the RTC may possess shall be tolled from the date of this Agreement to and including one hundred-thirty (130) days after the entry of either a final and unappealable judgment in the case known as *Winstar Corp. v. United States of America*, 64 F.3d 1531 ("*Winstar*"), which case was decided by the United States Court of Appeals for the Federal Circuit on August 30, 1995, or the entry of an order dismissing that case.

Because the tolling agreement applies only to goodwill claims, it is necessary to discern exactly the manner in which the agreement defined such claims. The recitals in the agreement limit the scope to damage done to institutions for which the RTC was acting as receiver: "[T]hese [regulatory] changes [the enactment of FIRREA] may have breached contractual obligations of the FHLBB to some institutions for which the RTC has been appointed receiver, or may have otherwise damaged these institutions. These claims shall be referred to as 'Goodwill Claims....'"

Because the tolling agreement also is limited to damages incurred by institutions for

which the RTC was acting as receiver, the viability of the receivership deficit component of plaintiff FDIC's claim depends on a finding that Statesman Bank suffered this injury. For the reasons stated above, the court has found that the receivership deficit claim is an effort to make the FRF whole without regard to any recovery on the part of FDIC-receiver's goodwill claim; this aspect of plaintiff FDIC's claim therefore is beyond the ambit of the tolling agreement and is time-barred. The remainder of plaintiff FDIC's claim, for lost profits/lost equity value of Statesman Bank is covered by the tolling agreement and is not foreclosed.[19]

III. *Plaintiffs' motion for direct recovery*

■ Private plaintiffs' motion for direct recovery arose out of a concern that once the FDIC was permitted to intervene in the *Winstar*-related cases in general, and *Statesman* in particular, they would be prevented from recovering any damages—expectancy damages specifically—after having fought so diligently for so long. The court acknowledges private plaintiffs' *bona fides* in shouldering the burden of this litigation for over seven years. Nonetheless, in large part, the relief that private plaintiffs seek is contrary to well-settled jurisprudence.

Private plaintiffs urge that because they are signatories to the contract determined by the Supreme Court to have been breached, they have a unique status that places them in a significantly stronger position than the typical shareholder plaintiff. For this reason the court finds that private plaintiffs demonstrate persuasively that the numerous shareholder standing cases cited by defendant are inapposite to the case at bar.

In a case strikingly similar to the instant dispute, *Far West Federal Bank, S.B. v. Office of Thrift Supervision–Director*, 119 F.3d 1358 (9th Cir.1997), the Ninth Circuit ruled that investors in a failed thrift had standing to assert claims related to the enactment of FIRREA and affirmed a decision awarding restitution in the amount of the investors' capital infusion. 119 F.3d at 1363–64. In reaching this decision, the Ninth Circuit examined the totality of the circumstances under which the parties had entered into the contract and determined that the contract had been intended to benefit the investors; thus, when the contract was breached the investors, as well as the corporation, were damaged. *Id.*

To the extent that they seek restitution, private plaintiffs' arguments in the instant case are more persuasive than those of the *Far West* plaintiffs in that private plaintiffs signed the contracts at issue in their individual capacities. Recognizing the persuasiveness of *Far West*, defendant has conceded that private plaintiffs are entitled to restitution damages. *See* Def's Br. filed Feb. 13, 1998, at 2 ("We agree that the Statesman plaintiffs may assert a claim for restitution, namely the return of their investment in Statesman Bank, independent of the FDIC–R").[20] The court concurs and will allow private plaintiffs to proceed for direct recovery on their restitution claim.

■ Private plaintiffs, however, fail to recognize that allowing a case for restitution of their initial investment to go forward is in many ways an extraordinary remedy. In the vast majority of cases, an investor who loses money infused into a corporation is not entitled to a return of the investment. Only because of the distinctive nature of the contract at issue are private plaintiffs entitled to direct recovery by restitution. Consequently, private plaintiffs go beyond rights recognized by case law in seeking to recover ex-

19. Plaintiff FDIC maintains that its entire claim cannot be time-barred because it relates back to a claim filed by private plaintiffs in 1990. *See* RCFC 15(c). Insofar as the claim encompasses claims that Statesman Bank or a previous owner of Statesman Bank's claims could have brought, plaintiff FDIC is correct. However, the receivership deficit is not a claim that properly could have been brought by either Statesman Bank or its receiver. At heart the receivership deficit is a claim held by the FRF as insurer of Statesman Bank. Although the court is of the opinion that the receivership deficit may have been a viable claim at one point, it is no longer.

20. The court understands that defendant does not concede that private plaintiffs actually are entitled to a return of their entire investment and that at trial defendant will endeavor to reduce the amount of restitution damages through offsets.

pectancy damages, *i.e.,* Statesman Bank's lost profits or its value as a going concern.

Private plaintiffs postulate that because they are signatories to the breached contract, because they were the sole owners of Statesman Bank before the breach, because they have been litigating this case for over seven years, and because plaintiff FDIC transformed itself from putative defendant to professed plaintiff after the Supreme Court validated private plaintiffs' breach claim, they are entitled to such damages directly. Although the court is sympathetic to private plaintiffs' argument, they cannot cite a single case as authority for the proposition that they are entitled to direct recovery of expectancy damages. Private plaintiffs also ask the court to ignore the presence of the receiver in this litigation. Regardless of the undeserved situation in which private plaintiffs find themselves. the court cannot overlook basic principles of corporate and receivership law.

In weighing the merits of what private plaintiffs term their "common sense" arguments, proffered in lieu of case law or statutory authority, it is axiomatic that in general damages suffered by a corporation are recoverable by the corporation, not by its shareholders. *See Twohy v. First Nat'l Bank,* 758 F.2d 1185, 1193 (7th Cir.1985). The circumstances of this case are atypical, so the numerous shareholder standing cases cited by defendant cannot be applied mechanically to deny plaintiffs direct recovery on their expectancy damages claims. To do so would overlook the fact that private plaintiffs undeniably have suffered injuries distinct from those of the corporation and were themselves signatories to the breached contract.

*Far West* provides some guidance with respect to the nature of similar investors' injuries and the type of compensation to which they are due. Private plaintiffs assert that the Ninth Circuit only had before it the question of restitution damages and did not address the question of expectancy damages. Insofar as the damages discussed in *Far West* are designated restitution damages, private plaintiffs are correct; however, the nature of the relief sought by *Far West* plaintiffs was significantly broader than the

narrow meaning of restitution used by all of the parties in the case at bar. Before the trial court, *see Far West Federal Bank,* 787 F.Supp. 952, 961 (D.Or.1992), *aff'd,* 119 F.3d 1358, plaintiffs argued that "any award of restitution should reflect, not only their initial investment in Far West, but also the increase [in] Far West's value as a result of their stewardship." Thus, *Far West* plaintiffs sought to recover not only their initial $26 million investment, but also an additional approximately $100 million reflecting the increase in value of Far West during their ownership of the institution.

The trial court declined to grant plaintiffs damages beyond their initial investment. The court noted that the additional compensation sought by plaintiffs—the improvement in Far West's financial condition—"would have inured to the benefit of plaintiffs, as shareholders." 787 F.Supp. at 962 n. 4. The investors appealed, and the Ninth Circuit affirmed, the decision to limit the investors' recovery to a return of the capital infusion.

To award private plaintiffs restitution measured by or representing expectancy damages would circumvent the purpose of creating a corporation. Private plaintiffs are in essence claiming only the benefits of corporate status, in that they seek to recover the corporation's lost profits without incurring directly any of the corporation's liabilities. A corporation cannot be used indiscriminately as both a sword and as a shield. *See Alford v. Frontier Enters.,* 599 F.2d 483, 484 (1st Cir.1979). Because private plaintiffs have no obligation to satisfy any of Statesman Bank's creditors, they are not entitled to recover the corporation's profits directly.

Another obstacle to permitting private plaintiffs direct recovery is that such a ruling would disregard the plain meaning of the word "profit." A corporation's profits are not all of the funds that flow into its coffers. Profits are by definition those funds that remain after satisfaction of all liabilities. Awarding all of Statesman Bank's lost profits directly to private plaintiffs would grant them money to which they are not, and never would be, entitled. In other words, included in Statesman Bank's liabilities are depositors' funds. Were it still operating today, States-

man Bank would be required to return depositors' funds on demand; it could not simply close its doors, sell off its fixtures, and keep its depositors' funds.

The fact that depositors have been made whole by the RTC does not entitle Statesman Bank to act as if it is no longer responsible for those funds. As plaintiff FDIC explains, when the RTC complied with its duty to make the Statesman Bank depositors whole, the RTC became subrogated to their claims. Thus, private plaintiffs cannot argue credibly that because an insurer satisfied Statesman Bank's depositors, the insurer's claim is any different from those of the depositors themselves. *See* 12 U.S.C. § 1821(g)(1) (stating that corporation has the same rights to assets of failed institution as depositors).

The most significant problem facing private plaintiffs is that a receiver is in place for Statesman Bank. As plaintiff FDIC points out, if private plaintiffs took issue with the appointment of a receiver, they should have raised any concerns at an earlier date pursuant to 12 U.S.C. § 1464(d)(2)(B). Having failed to challenge the installation of a receiver, private plaintiffs must now accept the consequences of that decision.

That a receiver is in place does not necessarily frustrate private plaintiffs' claims. The Federal Circuit in *California Housing Securities, Inc. v. United States*, 959 F.2d 955, 957 n. 2 (Fed.Cir.1992), rejected defendant's argument that a shareholder lacked standing to sue either as an individual or derivatively. However, the Federal Circuit conditioned the shareholder's standing on the court's construction of the complaint as seeking to produce a surplus in the receivership that would inure to the benefit of the shareholders. *See* 12 U.S.C. § 1821(d)(11)(A). Although the situation in *California Housing* differs from that of the case at bar in that it is not a *Winstar*-type situation wherein the

shareholder is also a signatory to the contract, the case does suggest that the presence of a receiver does not preclude a shareholder suit, but that the damages recovered from that suit will be used to fund a surplus that ultimately will inure to the shareholders' benefit.[21]

Once appointed, the receiver is required to gather the underlying institution's assets and disperse them in accordance with an established priority scheme set by statute. To accept private plaintiffs' allegations that their claim now can be considered outside the rubric of receivership law would raise the possibility of a double recovery. No question exists that the corporation, and therefore the receiver, is entitled to bring a claim for Statesman Bank's lost profits/lost equity value, but the court can award such damages only once. No authority authorizes the court to prorate the expectancy damages based on the degree of damage suffered by each party. Even if there were, private plaintiffs' damages are subsumed within those of the corporation in that their losses take the form of decreased stock value, lost dividends, and/or the inability to sell or merge Statesman Bank on the open market.

The danger of allowing private plaintiffs direct recovery is illustrated by *In re Ionosphere Clubs, Inc.*, 17 F.3d 600 (2d Cir. 1994).[22] In denying plaintiffs a right to recover directly the proceeds of their lawsuit, the court stated:

> If the Proposed Defendants were to pay damages directly to [shareholders] rather than to [the bankrupt entity], the [shareholders] would receive compensation for their foregone dividends while claimants senior in priority to them went unpaid, thus defeating the bankruptcy code's system of priorities. On the other hand, a complete recovery by the corporation would rectify the injury suffered by the [shareholders] were [the bankrupt entity]

---

**21.** The Federal Circuit reached an identical conclusion in *Branch v. United States*, 69 F.3d 1571, 1575 (Fed.Cir.1995), stating:

> As trustee in bankruptcy BNEC, Branch not only holds all the shares of the Maine National Bank, but also represents the interests of the shareholders of BNEC. A judgment favorable to the plaintiff in this case would increase the

assets of BNEC and could result in a surplus that would benefit BNEC's shareholders.

**22.** This case is useful only to illustrate the dangers of direct recovery and is otherwise inapposite to the case at bar because it involves a bankruptcy proceeding and plaintiffs without a clear right to some sort of recovery independent of that of the corporation.

to recover the diverted funds and thus be restored to financial health, it would then be able to fulfill its contractual obligations to the [shareholders].

17 F.3d at 606. Similar logic applies in the instant dispute in that receivership law once in place requires the failed thrift's assets to be distributed in a specified order. Although private plaintiffs may once have been the sole owners of Statesman Bank, they are no longer. Having been displaced, private plaintiffs have no choice but to operate within the confines of the receivership priority system.

Because private plaintiffs were signatories of the contract determined to have been breached, they are entitled to some degree of recovery independent from that of the corporation. In this respect private plaintiffs are beyond the reach of *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 1980 WL 13154 (1980), and other suits denying shareholders standing to sue for diminution in value of corporate assets. Private plaintiffs' situation is more analogous—although not completely so—to *Buschmann v. Professional Men's Ass'n,* 405 F.2d 659 (7th Cir.1969), in which plaintiff, as an individual, was party to a contract that subsequently was breached. The corporation had a cause of action arising out of the same wrongful acts, but the court permitted plaintiff to proceed upon his own cause of action that was independent from that of the corporation.

*Buschmann* was cited with approval by the Ninth Circuit in *Far West, see* 119 F.3d at 1364. and its logic evidently applied. While the court considers the Ninth Circuit opinion persuasive because it held that a return of the investors' capital infusion to be a reasonable measure of restitution, the trial court confined its findings to the facts. Under these circumstances the Ninth Circuit's decision does not foreclose private plaintiffs from proving a more generous measure of restitution, but it cannot be measured by or represent expectancy damages. Because such proceeds constitute funds related to the injury sustained by Statesman Bank, any expectancy damages that the FDIC might recover must flow through the receivership. Providing private plaintiffs with restitution honors their status as signatories and allows them to recover damages that they suffered personally.[23]

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Plaintiff FDIC's motion for partial summary judgment is granted, insofar as plaintiff FDIC is entitled to a judgment on liability against defendant consistent with the Supreme Court's decision in *Winstar,* and defendant's cross-motion is denied.

2. Defendant's motion to dismiss is granted insofar as plaintiff FDIC's complaint is dismissed for lack of subject matter jurisdiction as to the claim for the receivership deficit.

3. Private plaintiffs' motion for direct recovery is denied in part. Private plaintiffs may not recover directly for expectancy damages suffered by Statesman Bank, although they may continue to advocate the claim at trial on behalf of plaintiff FDIC in its receivership capacity. Private plaintiffs may seek direct recovery for restitution.[24]

The court is also aware that Chief Judge Smith has ordered briefing on Common Issue No. 11, which will address, among other issues, what entity owns particular claims. To the extent that Chief Judge Smith should render a decision inconsistent with this opinion, private plaintiffs may move for reconsideration of this issue.

**23.** Although the court denies private plaintiffs' motion for direct recovery in part, it recognizes that they have carried the burden on the expectancy damages issue at least since the date of the tolling agreement between the RTC and defendant. For this reason the court suggests that private plaintiffs explore legal authority that could support a finding of an implied-in-fact contract by which plaintiff FDIC would be required to compensate private plaintiffs for the attorneys' fees and expenses incurred pursuing expectancy damages insofar the court may award such damages at a level below that which would create a receivership surplus.

**24.** Private plaintiffs pleaded reliance damages as another measure of recovery. This opinion does not speak to that claim.

## ORDER

On April 27, 1998, three days before the pretrial conference scheduled for April 30, plaintiffs filed Plaintiffs' Motion To Renew Prior Motion for Summary Judgment as to Liability. The motion is untimely and not warranted by any new development. Moreover, plaintiffs made no effort to address Judge Wiese's prior ruling on this point. *See Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed.Cl. 174, 187 n. 9 (1997). Accordingly,

**IT IS ORDERED**, as follows:

Plaintiffs' Motion To Renew Prior Motion for Summary Judgment as to Liability is denied.

## ORDER ON MOTION FOR RECONSIDERATION

On April 27, 1998, private plaintiffs filed Plaintiffs' Motion for Reconsideration or, in the Alternative, Clarification, of the Court's Decision on Plaintiffs' Motion for Direct Recovery, and Emergency Request for Continuance, which was received in chambers on April 28. On April 29, 1998, the court's chambers notified counsel for defendant and plaintiff FDIC that no response was required at this late date and that the court was not inclined to grant either the motion or a continuance. However, plaintiff FDIC apparently had responded earlier on April 29, 1998.

Private plaintiffs seek to have the court reconsider its decision, *see Statesman Savings Holding Corp. v. United States*, 41 Fed. Cl. 1, 15–18 (Apr. 22, 1998), limiting private plaintiffs' direct recovery to restitution. Moreover, in light of what private plaintiffs' characterize as a decision "on the eve of trial," they have requested a continuance of one month.

Although the court finds private plaintiffs' motion for reconsideration to be without merit, it will endeavor to alleviate certain of the purported ambiguities raised by private plaintiffs. Specifically, private plaintiffs are

correct insofar as the court's April 22 opinion did not define the nature of the expectancy damages that might be awarded. The parties' replies to the outstanding motions *in limine* reveal that, since a date prior to transfer of this case for trial, plaintiffs—both private and the FDIC—have been operating under a division of labor to which the court was not privy. See Plaintiff Federal Deposit Insurance Corporation's Reply to Defendant's Motion in Limine Concerning Plaintiffs' Claim for Restitution, filed Apr. 21, 1998, at 2–3 & n. 2.[1] The court has also been assisted by plaintiff FDIC's reply to its motion *in limine* concerning the testimony of Dr. John Bovenzi. This filing, responding to the court's tentative ruling on the outstanding motions *in limine* filed concurrently with the April 22 opinion, demonstrates the continued relevance of Dr. Bovenzi's testimony.

As a consequence of these filings, the court understands that plaintiffs are dividing the responsibilities of proving expectancy damages. Therefore, the scope of the evidence pertaining to expectancy damages admissible at trial will include Dr. Bovenzi's testimony on the lost value of Statesman Bank's assets. Any damages awarded by the court will be based on both private plaintiffs' model regarding lost profits, as well as plaintiff FDIC's evidence addressing the losses suffered by Statesman Bank because of its closure. Plaintiff FDIC states:

> In pursuing this whole claim, the FDIC is not suing as a creditor of the failed thrift, but as the successor to, and in the right of, Statesman Bank. In sum, implicit in the lost profits model is the fact that if Statesman Bank were open and operating today, it would be paying all of its creditors on a[n] ongoing basis.

Plf FDIC's Br. filed Apr. 28, 1998, at 4. This clarification is not inconsistent with the court's decision to foreclose an independent claim by plaintiff FDIC as a creditor of Statesman Bank. Both the evidence of private plaintiffs and of plaintiff FDIC are elements of the total expectancy damages suffered by Statesman Bank. Any damages

---

1. Although this reply was filed on April 21, 1998, it was received by the court subsequent to the issuance of the April 22 decision.

related to this claim to which Statesman Bank may be entitled will flow through the receivership.[2]

Private plaintiffs' request for a continuance at this late date is not a legitimate response to any unforeseeable development. Private plaintiffs made a tactical decision to file their motion for direct recovery; they were not required to do so. It should be apparent to private plaintiffs that by filing a motion one runs the risk of receiving an adverse ruling. By filing a memorandum in support of their motion without one case citation for the proposition that the law recognizes a right to direct recovery in these or similar circumstances, one also runs the risk that oral argument will not be scheduled. The court stated during the March 6, 1998 status conference that it would make every effort to rule on the outstanding motions prior to trial. *See* Transcript of Proceedings, *Statesman Savings Holding Corp. v. United States*, No. 90–773C, at 34 (Fed.Cl. Mar. 6, 1998). Private plaintiffs' failure to consider the ramifications of an adverse ruling is not a sufficient reason to delay a trial that they have been pursuing aggressively for several years, the scheduling of which also affects many of the other Winstar-related cases pending before the Court of Federal Claims.[3] Accordingly,

**IT IS ORDERED**, as follows:

1. Private plaintiffs' motion for reconsideration is denied.

2. Private plaintiffs' request for a clarification is granted insofar as plaintiff FDIC will be permitted to call Dr. John Bovenzi to testify on one component of the expectancy damages claim that is owned in its entirety by plaintiff FDIC as receiver.

3. As further clarification the court strikes footnote 23 of the April 22 opinion. Because of the division of labor between private plaintiffs and plaintiff FDIC, no need arises for plaintiff FDIC to compensate private plaintiffs for carrying the burden on the lost profits aspect of expectancy damages.

4. Private plaintiffs' emergency request for a continuance is denied.

5. The Clerk of the Court shall serve a copy of this order on counsel by facsimile transmission at 202/822–8966, 942–3656, and 307–0972.

---

**2.** The court reiterates the statement made in the April 22 opinion that it has not foreclosed private plaintiffs from pursuing any reliance damages to which they might be entitled as an alternative to restitution. This ruling is not inconsistent with the law that breach damages are an alternative to restitution or reliance damages. The breach damages suffered by private plaintiffs are different than those incurred by Statesman Bank. The court has not ruled on whether private plaintiffs as investors in Statesman Bank may recover restitution or reliance damages and also expectancy damages, *i.e.*, participate as shareholders of Statesman Bank in any surplus recovered by the receiver as expectancy damages.

**3.** Insofar as private plaintiffs consider it necessary to investigate further the applicability of equitable subordination, they are free to do so and may bring their findings to the court's attention via a post-trial brief, if their investigation so warrants.