**FIRST NATIONWIDE BANK,
et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–590C.

United States Court of Federal Claims.

Nov. 28, 2000.

**250**

John D. Taurman, Washington, D.C., argued for plaintiffs. With him on the briefs were Harry M. Reasoner and Thomas P. Marinis, Jr.

Scott Austin, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, argued for defendant. With him on the briefs were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Glenn I. Chernigoff, Paul G. Freeborne, and Kenneth M. Kulak, each of the U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related[1] case are defendant's motion for leave to file an amended answer; plaintiffs' motion for partial summary judgment; defendant's cross-motion for partial summary judgment or, in the alternative, request for discovery; plaintiffs' motion to strike certain testimony; and defendant's motion for leave to file reply to plaintiffs' supplemental brief. Oral argument was held on September 28, 2000. At oral argument, the court allowed the parties to file supplemental briefs. For the reasons set forth below, defendant's motion to file an amended answer is granted, plaintiffs' motion for partial summary judgment is denied, defendant's cross-motion for partial summary judgment is granted in part and denied in part, defendant's request for discovery is denied, plaintiffs' motion to strike is denied, and defendant's motion for leave to file reply to plaintiffs' supplemental brief is granted.

## BACKGROUND[2]

This case is one of a group of five pending "tax benefit" cases that arise out of a series of agreements entered into by the Federal Savings and Loan Insurance Corporation ("FSLIC") with various financial institutions in late 1988. Pursuant to these agreements, the FSLIC promised certain assistance to these financial institutions in regard to their acquisition from the FSLIC of the assets and liabilities of failing thrifts. In the pending tax benefit cases, the plaintiff financial institutions allege that their agreements with the FSLIC contained the promise of tax deductions for losses incurred as the result of the subsequent sale of certain thrift assets purchased by the plaintiffs from the FSLIC ("covered asset losses"), even though the agreements also provided that the FSLIC would reimburse the plaintiffs for the losses. The plaintiffs in these five cases have sued the government for breach of their agreements with the FSLIC, claiming that the government, through Congress's enactment of § 13224 of the Omnibus Budget Reconciliation Act of 1993 (popularly referred to as the "Guarini legislation"), has broken its promise of tax deductions for covered asset losses by making those deductions unavailable.[3]

---

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. The relevant facts are undisputed and are drawn largely from defendant's revised proposed findings of uncontroverted fact in support of defendant's cross-motion for partial summary judgment. Other background information can be found in plaintiffs' motion for partial summary judgment and defendant's cross-motion for partial summary judgment. Because the relevant facts are not in dispute, the issues presented here are appropriate for summary judgment.

3. There *is* some doubt as to whether these tax deductions were available under the Internal Revenue Code even at the time the agreements

As damages for this alleged breach of contract, the plaintiffs in the other four tax benefit cases seek the amount that would have been saved in taxes had the Guarini legislation not been enacted. However, the plaintiffs in this case, First Nationwide Bank, First Gibraltar Holdings, Inc., and MacAndrews & Forbes Holdings, Inc., without abandoning other claims they have in common with the other tax benefit plaintiffs, seek an additional remedy because of the unique assistance agreement they entered into with the FSLIC. The issues associated with that unique assistance agreement have been brought before the court in plaintiffs' motion for partial summary judgment.

The assistance agreement in question ("Assistance Agreement") provided for only ninety percent reimbursement by the FSLIC of the covered asset losses, rather than for full reimbursement as was the case with the assistance agreements at issue in the other tax benefit cases. Plaintiffs allege that the FSLIC's right to reimburse them for only ninety percent of their covered asset losses was contingent upon the continued availability of the tax deductions that were eliminated by the Guarini legislation. This allegation is based on plaintiffs' assertion that the ten percent of the reimbursement retained by the FSLIC represented the FSLIC's share of the benefits derived from those tax deductions. Without the availability of the deductions, plaintiffs aver, the basis for anything less than full reimbursement vanishes. Consequently, the unique remedy sought by plaintiffs in this case is return of the ten percent of the full reimbursement amount[4] retained by the Federal Deposit Insurance

Corporation ("FDIC") after enactment of the Guarini legislation.[5]

In their initial brief in support of their motion, plaintiffs set forth several theories they claim entitle them to the additional ten percent.[6] In plaintiffs' supplemental brief, a new theory is presented. The theories presented in the initial brief are as follows:

1. "Contemporaneous Government Documents[,] Incorporated by the Assistance Agreement's Integration Clause[,] Confirm that the Parties' Tax Benefit Sharing Arrangement Was Contingent on the Availability of a Tax Benefit to Share." Pls.' Mot. Part. Summ. J. at 36. Therefore, under the Assistance Agreement, the FDIC is not entitled to retain ten percent of the full reimbursement amount;

2. "The Most Reasonable Interpretation of the Assistance Agreement is that FSLIC's Right to Reimburse Only the 'After–Tax' Portion of Covered Asset Losses Did not Apply Unless a Tax Deduction Was Available." Id. at 37. Plaintiffs here aver that the Assistance Agreement is ambiguous regarding the level of reimbursement for covered asset losses should the covered asset loss deduction become unavailable. That ambiguity, for a number of reasons presented, should be resolved in plaintiffs' favor. After the ambiguity has been properly resolved, the FDIC is not entitled to retain ten percent of the full reimbursement amount;

3. "To the Extent the Language of the Assistance Agreement Cannot Be Construed to Reflect the Parties' True Agreement Regarding the Scope of Their Tax Benefit Sharing Arrangement, It Should be Reformed to Do So." Id. at 41. Here, plaintiffs argue

were entered into. It is unnecessary to resolve this issue at the present time.

**4.** Plaintiffs estimate that this ten percent of the full reimbursement amount equals approximately $75 million.

**5.** The FDIC is the manager of the FSLIC Resolution Fund, a fund that was created to assume the assets and liabilities of the FSLIC when the FSLIC was abolished in 1989. See Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified in 12 U.S.C.).

**6.** At oral argument, the first four of these theories were referred to as the contract interpretation theories. See Tr. at 46–47. In their opening brief, the plaintiffs grouped these four theories under the heading, "The Government Breached Its Contractual Obligations to Plaintiffs by Retaining Money for Tax Benefits That Were Not Available to the Acquirers Under the Tax Code." Pls.' Mot. Part. Summ. J. at i. In presenting the question raised by all four of these theories, the plaintiffs state, "The only question is whether the FDIC is contractually entitled to retain 10% of the pertinent covered asset losses despite the unavailability of a corresponding tax deduction." Id. at 32.

that the parties to the Assistance Agreement made a material mistake of fact in believing that the written memorial of the Assistance Agreement accurately reflected the parties' agreement. That material mistake provides a basis for reforming the contract in plaintiffs' favor. Therefore, under the reformed Assistance Agreement, the FDIC is not entitled to retain ten percent of the full reimbursement amount;

4. "Should the Court Find Insufficient Evidence that the Parties Actually Reached Agreement With Regard to the Sharing of Unavailable Tax Benefits, the Court Should Imply a Contractual Term In Order to Preserve the Essence of the Parties' Transaction." *Id.* at 43. That term should require full reimbursement of the plaintiffs in the event the deduction becomes unavailable. "The government therefore breached the Assistance Agreement by continuing to withhold full assistance payments even after the Guarini legislation retroactively repealed the tax benefit that had existed since 1981." *Id.* at 47; and

5. "The Government's Actions Breached its Obligation of Good Faith and Fair Dealing under the Assistance Agreement." *Id.* at 47. Plaintiffs' argument here is that the enactment of the Guarini legislation itself constituted a breach of the obligation of good faith and fair dealing under the Assistance Agreement. *See id.* at 48. Therefore, as a result of that breach, the FDIC is not entitled to retain ten percent of the full reimbursement amount.

Common to all five of these initial theories is the unique provision of the Assistance Agreement permitting the FSLIC to reimburse only ninety percent of covered asset losses. It is noteworthy, moreover, that a common denominator in the first four theories is that the event of breach is the failure of the FDIC to pay one hundred percent reimbursement for the covered asset losses upon failure of the deduction. Only in the fifth theory is the event of breach the passage of the Guarini legislation itself.

In their supplemental brief, plaintiffs present a theory that was not articulated in their prior filings. The first four theories asserted in plaintiffs' original motion rest on the argument that enactment of the Guarini legislation gave rise to a duty on the part of the FDIC to provide full reimbursement for covered asset losses; consequently, non-payment of that full reimbursement was a breach of a contract duty. The new argument is different. Plaintiffs now argue that enactment of the Guarini legislation discharged a duty on the part of plaintiffs to make tax benefit payments to FSLIC.[7] Thus, this theory does not depend on an allegation that the FDIC breached the contract.[8]

Opposing plaintiffs' motion, defendant asserts, among other arguments, that a settlement and termination agreement between plaintiffs and the FDIC in a prior case bars plaintiffs from arguing any of these theories under the doctrines of accord and satisfaction and release. The termination and settlement agreement ("Settlement Agreement") defendant relies on was entered into on August 19, 1996, to terminate the Assistance Agreement and to resolve a lawsuit brought against the FDIC in 1995. That lawsuit was styled *First Texas Bank v. FDIC*, Civil Action No. 3:95–CV–2584–H (N.D. Tex. filed Nov. 20, 1995). The plaintiff in that case, First Texas Bank, is a predecessor in interest to plaintiff First Nationwide Bank. Consequently, the Settlement Agreement's provision (§ 2.3) regarding the termination of the Assistance Agree-

---

7. "The failure of the condition of deductibility to occur negates performance of any duty to make tax benefit payments pursuant to the 10 percent reductions in covered asset loss reimbursements." Pls.' Suppl. Br. at 4.

8. In their supplemental brief, in addition to raising this new theory, plaintiffs also make clear what arguments they are not making:
   This is not a case in which both parties to a contract made a basic assumption that affected the terms of their contract but later turned out

to be incorrect, and one of the parties seeks to be excused from performance of the contract under doctrines such as mutual mistake. *Cf.* 9/28 Tr. 86–90, 125–30. Here, the parties agreed to share a benefit they believed to be available, and the question is whether Plaintiffs are contractually obligated to continue the sharing payments after the benefit is gone. Plaintiffs seek to implement the parties' agreement, not to be excused from it on grounds of mistake.
Pls.' Suppl. Br. at 6 n. 5.

ment is relevant to the case at hand. Also relevant, because of the government's arguments, are the Settlement Agreement's provision (§ 12.2) regarding the release of the FDIC as manager of the FSLIC Resolution Fund ("FRF"), the Settlement Agreement's provisions (§§ 4.1 and 4.2) regarding the continuing viability of claims, and the Settlement Agreement's provision (§ 2.1) regarding the payment of a settlement sum to plaintiffs.

It is helpful to set out in full the relevant sections of the Settlement Agreement. Section 2.1, *Payment of Settlement and Termination Payment*, states:

> The FDIC Manager shall pay or cause to be paid to First Nationwide, in the manner provided in Section 2.4 of this Article 2, Thirteen Million One Hundred Sixty Two Thousand Nine Hundred Thirty-one and No/100ths Dollars ($13,162,931) (the "Settlement and Termination Payment").

Section 2.3, *Termination of Assistance Agreement*, states:

> The parties hereto agree that, except as otherwise provided for herein, upon the occurrence of the Closing, the Assistance Agreement (including any and all provisions therein which explicitly survive the termination or expiration of the Assistance Agreement) and all rights and obligations of the parties thereto not previously fulfilled shall terminate effective as of the Closing Date, save and except: (a) the FDIC Manager's obligation to indemnify First Nationwide pursuant to Section 7(a)(1)–(3) of the Assistance Agreement after the termination of the Assistance Agreement; and (b) the settlement agreement reached between the FDIC and First Nationwide, dated January 11, 1994, relating to the GLOS audit of legal fees which resolved disputes arising prior to September 30, 1993.

Section 4.1, *Settlement of Lawsuit*, states:

> Within one business day after the Closing Date, First Nationwide, the Acquirers and the FDIC Manager will instruct their attorneys to prepare and file a Stipulated Order of Dismissal of the Lawsuit pursuant to which any and all claims asserted by either party to the Lawsuit shall be dismissed with prejudice, except as provided in Section 4.2 below.

Section 4.2, *Excepted Claims*, states:

> Excepted entirely from this Agreement (and hereinafter referred to as the "Excepted Claims") are any and all actions and causes of action, suits, disputes, debts, accounts, promises, warranties, damages, claims, proceedings, demands, and liabilities, of every kind and character, direct and indirect, known and unknown, at law or in equity, that First Nationwide or the acquirers now have, have had at any time heretofore, or hereafter may have against the United States of America for breach of contract or constitutional taking by reason of the enactment of Section 13224 of the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66 (the "Guarini Legislation"). It is the intention of the parties hereto that all claims and counterclaims asserted in the Lawsuit be dismissed with prejudice, except that such dismissal shall expressly preserve the rights, if any, of First Nationwide and the Acquirers to assert the Excepted Claims solely against the United States of America in the United States Court of Federal Claims. The Excepted Claims shall not be based on any acts or omissions of the FDIC in any capacity or the RTC [Resolution Trust Corporation] as named defendant in any forum at any time in the future. Nothing contained in this Agreement shall, or shall be deemed to, constitute an admission of any allegation in the Lawsuit, or waive or relinquish any defenses that the United States of America may have to the Excepted Claims preserved by this Section 4.2.

Section 12.2, *Release by First Nationwide and the Acquirers*, states:

> First Nationwide and the Acquirers each hereby release, hold harmless, acquit, and forever discharge the FDIC Manager [a term used in the Settlement Agreement to refer to the FDIC in its capacity as Manager of the FRF] and the FDIC in all its capacities other than as Manager of the FRF, and their respective present and former parents, subsidiaries and affiliates, and the respective present and former officers, directors, successors, assigns, em-

ployees, agents, and representatives of all the foregoing (collectively, the "FDIC Released Persons") from and against any and all actions and causes of actions, suits, disputes, debts, accounts, promises, warranties, damages, claims, proceedings, demands and liabilities, of every kind and character, direct and indirect, known and unknown, at law or in equity, that First Nationwide and the Acquirers now have, have had at any time heretofore, or hereafter may have against the FDIC Released Persons by reason of any act or omission whatsoever by any FDIC Released Persons in connection with the Lawsuit, the Assistance Agreement, the supervision of the FDIC Released Persons with respect to the Covered Assets, Related Claims or any other matters governed by the Assistance Agreement, GLOS, the Acquisition Agreements, the ACSI Settlement, the Excess Proceeds Agreement, or any other agreements related thereto; *provided, however,* that the release provided in this Section 12.1 [sic] shall not limit the rights of First Nationwide and the Acquirers to bring any claim based on fraud, willful misrepresentation of a material fact, willful failure to disclose a material fact, or willful misconduct.

On August 19, 1996, the same day the Settlement Agreement was signed, the parties in *First Texas* filed a stipulation of dismissal in the United States District Court for the Northern District of Texas. The language of the stipulated order of dismissal is similar to that of the Settlement Agreement. Regarding certain future claims, classified as Excepted Claims, the stipulated order states that these claims "may not be based on any acts or omissions of the FDIC or Resolution Trust Company, and may not be asserted against the FDIC in any forum at any time in the future."

On September 20, 1996, little more than a month after the dismissal, plaintiffs filed the present lawsuit. In its answer, defendant did not assert the affirmative defenses of accord and satisfaction and release. The first filing in which defendant raised these defenses was its cross-motion for partial summary judgment. Defendant has now filed a motion for leave to file an amended answer seeking to assert accord and satisfaction and release. Plaintiffs oppose the motion.

## DISCUSSION

### I. Defendant's Motion for Leave to Amend

■ Under Rule of the United States Court of Federal Claims ("RCFC") 15(a), leave to amend a pleading "shall be freely given when justice so requires." RCFC 15(a). However, undue delay by the party seeking leave and undue prejudice to the party opposing leave are alternative bases for denying leave to amend. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Plaintiffs contend that both undue delay on the part of the government and prejudice to them are present here. If the motion to amend is denied, plaintiffs also contend, on the basis of RCFC 8(c),[9] that defendant has waived the affirmative defenses of accord and satisfaction and release.

### A. Undue Delay

■ Nothing in plaintiffs' complaint or in any other document filed prior to plaintiffs' motion for partial summary judgment indicated that plaintiffs would attempt to make the precise arguments asserted in their motion for partial summary judgment.[10] There are two counts in plaintiffs' complaint. Count I begins at paragraph 27 of the complaint and incorporates the first twenty-six paragraphs of that complaint. Paragraph 26 refers to the ten percent reduction in assis-

9. RCFC 8(c) provides, "In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, ... release, and any other matter constituting an avoidance or affirmative defense."

10. The court does not, however, accept defendant's argument, made in its motion for leave to file an amended answer, that paragraph 37 of its initial answer provides defendant a fallback position. That paragraph states, "Defendant relies on all other matters which may constitute an avoidance or affirmative defense." If parties were able to preserve affirmative defenses in this manner, RCFC 8(c) would be meaningless.

tance payments, and paragraph 29 asks for "restitution of the benefits received by the Government as a result of its actions." There is thus notice in this count of the general claim to the additional reimbursement. The basis for claiming return of the "benefits received by the Government as a result of its actions"[11] is set forth in paragraph 28: "The Government's denial of the deductibility of reimbursed covered asset losses in connection with plaintiffs' First Texas acquisitions is contrary to the Government's contractual obligations to plaintiffs and frustrates a principal purpose of the transaction."

Count II, beginning at paragraph 30, also incorporates the first twenty-six paragraphs of the complaint, and at paragraph 32 asks for an award of "just compensation for the property the Government has taken." The basis for the claim asserted in Count II is that the denial of the covered asset loss deduction took plaintiffs' contractual rights in violation of the Fifth Amendment to the U.S. Constitution. While this language is perhaps less clear than that of Count I, it may have put the government on notice of the claim to the ten percent additional reimbursement.

A fair reading of the language of these two counts is that plaintiffs are basing their claims solely on Congress's enactment of the Guarini legislation. In addition, unlike the theories advanced in plaintiffs' motion for partial summary judgment, the gravamen of the complaint is their inability to take the deduction, not the retention of ten percent of the covered asset loss reimbursement. However, even if the complaint put the government on notice of plaintiffs' claim to the additional reimbursement, the complaint did not put the government on notice that plaintiffs would assert grounds in support of that claim which were inconsistent with the Settlement Agreement. Indeed, the government concedes that the plaintiffs can seek recovery of the additional ten percent of the

full reimbursement. *See* Def.'s Reply to Pls.' Opp'n to Def.'s Cross-mot. at 8. What is unique is the assertion in the first four initial theories that the breaching party was the FDIC because it chose to retain the ten percent.

Later developments in the case prior to plaintiffs' motion for partial summary judgment also did not serve to provide the government with notice of the prohibited bases of recovery. Plaintiffs' reliance on the May 2, 2000, statement by defendant's counsel regarding his understanding of plaintiffs' claim illustrates plaintiffs' misconception. The statement made by defendant's counsel was, "[A]ll I've ever heard since I've been on this case is that it's the 10 percent claim." Transcript of Conference, May 2, 2000, at 38. This statement only indicates knowledge of the general nature of plaintiffs' claim; it does not demonstrate knowledge of the grounds contained in plaintiffs' motion. Plaintiffs also cite a footnote in the March 24, 1998, Joint Preliminary Status Report ("JPSR") that states that the plaintiffs are not pursuing claims based on the lobbying activities of the FDIC. *See* JPSR at 7 n. 11. Plaintiffs contend that this statement should have put the government on notice of their reliance on other activities of the FDIC as bases for recovery, such as retention of the ten percent amount in violation of the Assistance Agreement. That inference is not warranted.

Section 4.2 of the Settlement Agreement prohibits the Excepted Claims from being based on "any acts or omissions of the FDIC" or RTC. Plaintiffs' acknowledgment that its claims are not based on lobbying activities of the FDIC amounts to no more than an acknowledgment of the settlement. It did not put the government on notice that plaintiffs were claiming that the FDIC breached a promise when, despite enactment of the Guarini legislation, it retained ten percent of the full reimbursement amount for covered asset losses.[12]

---

**11.** The court is willing to operate under the assumption that these "benefits" include the additional reimbursement sought by plaintiffs in their current motion, although the language of the complaint is somewhat cryptic.

**12.** The same conclusion is reached when examining other statements made by plaintiffs throughout the course of the litigation. At the conference of December 4, 1998, plaintiffs' counsel stated, "[W]e don't have a so-called lobbying issue in our case. We settled a prior lawsuit and resolved that issue." Transcript of Conference,

Plaintiffs' citations to *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir.1997), and *Maul v. Constan*, 928 F.2d 784 (7th Cir. 1991), are inapposite. The defendant did not " 'lie behind a log' and ambush ... plaintiff[s] with an unexpected defense.' " *Venters*, 123 F.3d at 968–69. Defendant stated its understanding of plaintiffs' claims in its first filing in this case: "Plaintiffs specifically allege that they have been denied certain tax benefits that plaintiffs assert were promised to them in the course of the acquisition of the associations." Def.'s Unoppsd. Mot. for an Enlrgmnt. of Time at 1. This understanding is consistent with defendant's current position. In the absence of clearer notice, there was no undue delay on defendant's part in asserting the affirmative defenses of accord and satisfaction and release in the specific context of the arguments raised by plaintiffs in their motion for partial summary judgment.

The new theory raised in plaintiffs' supplemental brief, like the first four theories presented in their motion for partial summary judgment, also does not rely on an allegation that passage of the Guarini legislation was a breach of contract or a compensable taking. Instead, this theory alleges that passage of the Guarini legislation released plaintiffs from a contractual duty to make tax benefit payments. Consequently, for the reasons just discussed, there is no undue delay by the government in asserting the defenses of accord and satisfaction and release in the context of this new theory.

■ This same analysis does not hold true for defendant's argument that the general release of the FDIC as manager of the FRF bars plaintiffs' suit because any judgment in this case would be paid out of the FRF. The government did not present this defense un-

til oral argument. If the government is correct that the FRF would be the source for any judgment in this case due to the enactment of FIRREA in 1989, then this defense should have been raised in defendant's answer in 1996 because the only notice necessary to alert defendant to the possibility of this defense is that this case is *Winstar*-related, something obvious from the start. Defendant waited until now to assert a defense resting on arguments contained in a memo written by the Justice Department's own Office of Legal Counsel in 1998. Such delay does not comport with the requirements of RCFC 8(c). Accordingly, the defense based on the release of the FRF as a source for a money judgment in this case is barred because of undue delay.[13] The court must now determine whether allowing defendant to assert its other accord and satisfaction and release arguments would unduly prejudice plaintiffs.

### B. Undue Prejudice

■ In order to show undue prejudice, "the non-movant must demonstrate that one of the following circumstances will result: severe disadvantage or inability to present facts or evidence; necessity of conducting extensive research shortly before trial due to introduction of new evidence or legal theories; or excessive delay that is unduly burdensome." *St. Paul Fire & Marine Ins. Co. v. United States*, 31 Fed.Cl. 151, 153 (1994). Plaintiffs claim that they "cannot help but have been prejudiced by pursuing this case aggressively and at great expense for over three and a half years." Pls.' Opp'n to Def.'s Mot. for Leave at 7. They cite *Tenneco Resins, Inc. v. Reeves Brothers, Inc.*, 752 F.2d 630 (Fed.Cir.1985), for the proposition that "[t]he risk of substantial prejudice increases with the passage of time." *Tenneco*

---

Dec. 4, 1998, at 111–12. Like plaintiffs' statements in the JPSR, this statement did not give notice to the defendant of the bases of recovery asserted in plaintiffs' motion. In the same manner, plaintiffs' statement in its April 14, 1999, motion to compel discovery that the "discovery aimed specifically at lobbying by the FDIC or RTC ... is not directly pertinent to the *First Nationwide* case" does not assist plaintiffs' arguments. Again, for the reasons discussed above, this statement did not provide the necessary notice to defendant. In short, the theories present-

ed by plaintiffs' motion were not made apparent until that motion was filed in February of this year. Defendant's motion for leave to file an amended answer is a direct consequence of the differences between plaintiffs' complaint and that motion.

**13.** In any event, as we find below, this defense is inconsistent with the savings provision (§ 4.2) of the Settlement Agreement.

*Resins,* 752 F.2d at 634 (citation omitted). The delay here, however, is traceable to the fact that the complaint did not clearly articulate the theories on which plaintiffs now rely in their motion for partial summary judgment.

In any event, plaintiffs have had the opportunity to respond to defendant's accord and satisfaction and release defenses. No prejudice is apparent, particularly when, as explained below, the court would reject the substance of plaintiffs' first four theories. *See infra* at 263–64. The court will therefore consider the merits of the defenses.

## II. The Merits of the Parties' Cross-motions for Partial Summary Judgment

Defendant argues that the Settlement Agreement executed by plaintiffs and the FDIC in the *First Texas* case bars certain claims, or at least theories, presented in plaintiffs' motion for partial summary judgment based on an accord and satisfaction.[14] We agree with defendant that certain claims are barred, although not with all of defendant's arguments in this respect.

■ There are several essential elements of an accord and satisfaction: " 'proper subject matter, competent parties, meeting of the minds of the parties, and consideration.' " *Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 59, 343 F.2d 951 (1965) (quoting *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d 73, 76 (10th Cir.1949)). Most commonly, an accord and satisfaction is a " 'mutual agreement between the parties in which one pays or performs and the other

accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute.' " *Id.* Here, defendant argues that the Settlement Agreement in *First Texas* represents the accord reached by the parties and that, by necessary implication, the payment of the $13,162,931 sum specified in § 2.1 of the Settlement Agreement as the "Settlement and Termination Payment" represents the satisfaction of the accord.[15]

The Settlement Agreement terminates the 1988 Assistance Agreement entered into by the plaintiffs and the FSLIC and also settles claims raised in the *First Texas* lawsuit. The relevant portions of the Settlement Agreement are §§ 2.3, 12.2, 4.1, and 4.2, quoted fully above.

## A. Defendant's Argument Based on Termination of the Assistance Agreement

■ Section 2.3 provides that, "except as otherwise provided herein," the Assistance Agreement and "all rights and obligations of the parties thereto not previously fulfilled shall terminate" as of the closing date selected in the Settlement Agreement. Defendant contends that because plaintiffs' motion asserts a failure of the FDIC to provide the proper reimbursement for covered asset losses, plaintiffs are improperly seeking to enforce an obligation of the FDIC that arose under the Assistance Agreement and that ceased to exist after the closing date selected in the Settlement Agreement.

The court rejects this argument. Section 2.3 of the Settlement Agreement provides that "the Assistance Agreement ... and all

---

**14.** While defendant's amended answer also contains the defense of release, accord and satisfaction, as opposed to release, is the appropriate defense to be raised and considered in the context of the bilateral Settlement Agreement at issue in this case. " '[T]here has been an unfortunate tendency in the Government contract legal decisions to confuse the essentially bilateral nature of a settlement with the essentially unilateral nature of a release.' " *Ed. Zueblin, A.G. v. United States,* 44 Fed.Cl. 228, 232 n. 4 (1999) (quoting *McLain Plumbing & Elec. Serv. Inc. v. United States,* 30 Fed.Cl. 70, 79 n. 3 (1993)). Like the parties in *Ed. Zueblin, A.G.,* the parties to the Settlement Agreement in question here "clearly executed a bilateral settlement." *Id.* The only awkwardness here is that the Settlement Agree-

ment contains provisions labeled by the parties as releases. To avoid confusion, the court uses the term release when referring to provisions the parties themselves labeled releases.

**15.** At oral argument, plaintiffs' counsel conceded that this payment was in fact made. *See* Tr. at 17. Nevertheless, plaintiffs allege that there was no meeting of the minds regarding the settlement of these specific claims and also allege that there was no consideration given for the settlement of the specific claims that defendant alleges are barred. Plaintiffs do not contest that the remaining elements of a valid accord and satisfaction have been satisfied.

rights and obligations of the parties thereto not previously fulfilled shall terminate effective as of the Closing Date." As plaintiffs point out, this provision does not mean that all pre-existing rights, including legal claims, were extinguished. This court, in *Statesman Savings Holding Corp. v. United States*, 41 Fed.Cl. 1 (1998), summarized a holding in an earlier *Winstar*-related case concerning this issue of termination agreements: "[T]he termination of assistance agreements did not affect the Government's obligation to honor its promises respecting the accounting treatment of goodwill." *Statesman Sav. Holding Corp.*, 41 Fed.Cl. at 7 (citing *California Fed. Bank v. United States*, 39 Fed.Cl. 753, 764 (1997)). Only executory promises were terminated. *See id.*

The same is true here. The termination of plaintiffs' Assistance Agreement did not affect any causes of action they may have that accrued prior to execution of the Settlement Agreement. Section 2.3 only terminated the parties' rights and obligations with respect to continued performance. Plaintiffs here are not seeking continued performance of the Assistance Agreement; they are seeking damages for a breach that occurred during past performance. As the court stated at oral argument, "All future obligations are extinguished; there are no more rights and obligations under the contract. However, the parties still have whatever prior exposure that they had to litigation based on past performance." Tr. at 55. Absent a specific release, in other words, the parties are in no different position than if their rights and obligations under the contract had ended due to the expiration of the contract term. Section 2.3 does not bar the plaintiffs' current motion for partial summary judgment.[16]

#### B. Defendant's Argument Based on Release of the FRF as a Source for a Judgment

The court has already held that this defensive argument is barred because it was not raised in a timely manner. However, it also fails on its merits. At oral argument, defen-

dant referred to the possibility that any judgment or settlement in this case would be paid out of the FRF, rather than the government's Judgment Fund, and suggested that, under the Settlement Agreement, this fact might present an impediment to plaintiffs' claims. In its supplemental brief, defendant argues that a judgment or settlement in this case would indeed be paid out of the FRF and that plaintiffs' claims are therefore barred because § 12.2 of the Settlement Agreement releases the FDIC as manager of the FRF and, by necessary implication, the FRF itself, "from and against any and all actions and causes of action, suits, disputes, debts, accounts," etc. Defendant's argument, if accepted, would not simply require denial of plaintiffs' motion for partial summary judgment: it would require dismissal of plaintiffs' entire case.

The government's argument disregards the consequences of § 4.2 of the Settlement Agreement. That section excepts "entirely" from the Settlement Agreement certain claims identified as Excepted Claims. As long as a claim is an Excepted Claim, § 12.2 is no bar to its being raised here. The only limitation on Excepted Claims is that they cannot be based on any acts or omissions of the FDIC or RTC in any capacity. The court must now determine whether the arguments presented in plaintiffs' motion for partial summary judgment and their supplemental brief are Excepted Claims and, if so, whether they violate the limitation imposed on Excepted Claims.

#### C. Defendant's Argument Based on Settlement of Claims Against the FDIC

Section 4.1 provides for the preparation and filing of a "Stipulated Order of Dismissal of the [*First Texas*] Lawsuit pursuant to which any and all claims asserted by either party to the Lawsuit shall be dismissed with prejudice, except as provided in Section 4.2 below." Section 4.2 excepts "entirely" from the Settlement Agreement, including the release provisions of § 12.2, plaintiffs' claims

---

**16.** Even if defendant's argument regarding § 2.3 were accepted, any Excepted Claims that plaintiffs might bring are excepted "entirely" from the Settlement Agreement by § 4.2. Therefore, even

under the defendant's expansive reading of § 2.3, that section presents no bar to plaintiffs' Excepted Claims.

against the "United States of America for breach of contract or constitutional taking by reason of the enactment" of the Guarini legislation. Under § 4.2, Excepted Claims may be brought only in this court and only against the United States of America; the FDIC and the RTC cannot be named defendants. In addition, the Excepted Claims may not be based on any acts or omissions of the FDIC or the RTC in any capacity. Thus, a limitation was placed on the theories plaintiffs could use in pursuing the Excepted Claims.

The only recovery plaintiffs are seeking in their current motion is the additional ten percent reimbursement for covered asset losses.[17] In support, they assert several alternative theories, set forth above. For purposes of analysis, the court shall consider the first four of plaintiffs' initial theories collectively because the court finds that each of these theories points to the FDIC as the breaching party. The fifth initial theory and the new theory presented by plaintiffs' supplemental brief, which do not implicate the FDIC as the breaching party, shall be considered separately.

### 1. Plaintiffs' First Four Theories

■ The first four of plaintiffs' theories do not rest on the argument that the Guarini legislation was a breach of contract. As plaintiffs state in their opening brief:

> It is the retention of th[e] 10% of covered asset loss reimbursements, as the FDIC's purported "share" of a tax benefit that does not exist, that constitutes the breach of contract for which Plaintiffs seek partial summary judgment on liability in this Motion.... Given the terms of the parties' agreement, the decision by the government to withhold full assistance payments violated Plaintiffs' contract rights without regard to the reason why the tax benefits were unavailable to be shared.

Pls.' Mot. Part. Summ J. at 30–31.

Enactment of the Guarini legislation, under these theories, is simply a condition precedent to the FDIC's alleged duty to provide full reimbursement to plaintiffs for covered asset losses; enactment of the legislation gave rise to a duty on the part of the FDIC, pursuant to the Assistance Agreement as written by the parties or reformed by the court, to provide this full reimbursement. Under plaintiffs' analysis, the Assistance Agreement provided that the FSLIC and its successors would fully reimburse the plaintiffs for covered asset losses should the covered asset loss deduction become unavailable. After enactment of the Guarini legislation, plaintiffs allege, the FDIC wrongfully withheld full reimbursement; thus, the FDIC, not Congress, is the breaching party under these first four theories.

When questioned at oral argument regarding the identity of the breaching party under these first four theories, plaintiffs' counsel answered that the breacher was the United States. Tr. at 34, 131. This answer is unsatisfactory as it ignores the distinction drawn by the parties themselves in the Settlement Agreement between the United States and the FDIC; it is also at odds with plaintiffs' own briefing as evinced by the language contained in the above quotation from plaintiffs' motion. Plaintiffs chose to base the first four theories of their motion for partial summary judgment on the allegation that the FDIC breached the contract by retaining the ten percent amount of the full reimbursement. Thus, these claims are not Excepted Claims because Excepted Claims are only those that are brought against the "United States of America for breach of contract or constitutional taking by reason of the enactment" of the Guarini legislation. Their continuing viability, therefore, is not dependent upon whether or not they run afoul of the limitation placed on Excepted Claims by § 4.2 regarding "any acts or omissions of the FDIC."

Because these theories are not Excepted Claims, they are not excepted "entirely" from

---

17. Plaintiffs allege two types of harm caused by enactment of the Guarini legislation: "First, the elimination of the covered asset loss deduction reduced the tax savings Plaintiffs anticipated in connection with the disposition of covered assets. Second, the FDIC's retention of its purported share of the benefit from the deduction directly reduced the reimbursements received for covered asset losses. In this Motion, Plaintiffs seek to establish the government's liability only for the latter cost." Pls.' Mot. Part. Summ. J. at 49 n. 41.

the Settlement Agreement. Thus, § 12.2 of the Settlement Agreement regarding the release of claims against the FDIC is relevant.

It is almost intuitive that theories alleging breach of the Assistance Agreement by the FDIC would, in the ordinary course of things, be brought against the FDIC as a named party and not against the United States. While counsel for plaintiffs stated at oral argument that he believed that the claims of breach asserted against the FDIC in the *First Texas* litigation could have been asserted initially against the United States, Tr. at 13, it is not clear that this is true. In a case involving allegations that the FDIC as receiver had breached its duty to a savings and loan association by failing to institute a suit against the government, the U.S. Court of Appeals for the Federal Circuit stated, "If the [FDIC] has been derelict in the performance of its duties ..., the proper remedy would have been a suit against the [FDIC], not one against the United States." *Caguas Cent. Fed. Sav. Bank v. United States*, 215 F.3d 1304, 1310 (Fed.Cir.2000). Moreover, the statute prescribing the corporate powers of the FDIC, 12 U.S.C. § 1819, "does not indicate that the FDIC has federal agency status for all purposes." *St. Nicholas Apartments v. United States*, 943 F.Supp. 966, 970 (C.D.Ill.1996). "On the contrary, the FDIC has agency status only for purposes of 28 U.S.C § 1345 [a statute concerning the jurisdiction of the district courts over suits commenced by the United States, its agents, or its officers]." *Id.; see also* 12 U.S.C. § 1819(b)(1) (1994) ("The Corporation, in any capacity, shall be an agency of the United States for purposes of section 1345 of Title 28, without regard to whether the Corporation commenced the action.").

Even if, however, the United States may in this instance be sued on the basis of acts or omissions committed by the FDIC, plaintiffs in § 12.2 of the Settlement Agreement have released the FDIC, and, therefore, the United States, from and against "any and all actions and causes of action ... by reason of any act or omission whatsoever by [the FDIC] in connection with the Lawsuit, the Assistance Agreement, [or] the supervision of the FDIC ... with respect to the Covered Assets ...." This release includes theories of recovery based upon allegations that the FDIC breached the Assistance Agreement. Because plaintiffs' first four initial theories are based upon such allegations, they are barred by § 12.2 of the Settlement Agreement.

Under § 4.2 of the Settlement Agreement, Excepted Claims may not be based on any acts or "omissions of the FDIC in any capacity." As already stated, these first four theories rest on an allegation that the FDIC breached the Assistance Agreement. A breach by the FDIC, by definition, is an act or omission of the FDIC.[18] Consequently, these theories, even if they are considered Excepted Claims, are barred by § 4.2 of the Settlement Agreement.

To avoid the consequences of the argument defendant makes in this regard, plaintiffs aver that the language, "any acts or omissions of the FDIC," refers only to the lobbying activities of the FDIC regarding passage of the Guarini legislation, that the accord represents no other meeting of the parties' minds. Because they did not raise any claims or theories in the present case based upon these activities, plaintiffs argue, this suit is consistent with the Settlement Agreement.

■■■ "A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993) (cita-

18. At oral argument, defendant's counsel also argued that the signing of the Assistance Agreement itself is an "act" of the FDIC for purposes of § 4.2; and, therefore, all claims based on breach of the Assistance Agreement are barred by the Settlement Agreement. This argument, if accepted, would render § 4.2 meaningless as it would eliminate any cause of action for breach of the Assistance Agreement by Congress or anyone else. The exception would swallow the rule, thus violating a fundamental principle of contract interpretation: "We read the language of a particular contractual provision in the context of the entire agreement and construe the contract so as not to render portions of it meaningless." *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed.Cir.1996) (citations omitted).

tions omitted). "If a contract term is unambiguous, the court may not assign it another meaning, no matter how reasonable it may appear." *Cray Research, Inc. v. United States*, 44 Fed.Cl. 327 (1999) (citing *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1473 (Fed.Cir.1997)). There are perhaps few words in the English language as unambiguous as the word "any." It is not "susceptible of two different and reasonable interpretations." The word may not be assigned another meaning; and plaintiffs' claim to full reimbursement, by virtue of the first four theories they raise, is based on the allegedly wrongful failure of the FDIC to pay them, i.e. an omission of the FDIC. There is no apparent reason the word in this context would not embrace the primary obligation the FDIC allegedly undertook to make reimbursement payments.

Plaintiffs, citing *Statesman Savings Holding Corp. v. United States*, 41 Fed.Cl. 1 (1998), *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 427 F.2d 1233 (1970), and *Jansen v. United States*, 170 Ct.Cl. 346, 344 F.2d 363 (1965), urge the court to consider subsequent conduct of the parties to the Settlement Agreement in support of their contention that the parties did not reach an accord. The conduct to which plaintiffs point is the same conduct that they argue the court should find prevents the government from now amending its answer, i.e. defendant's failure over the course of this litigation to object to the complaint in this case on the grounds that it was inconsistent with the Settlement Agreement. This conduct, however, for reasons already discussed in the part of this opinion concerning defendant's motion for leave to file an amended answer, is consistent with the position defendant now takes in its cross-motion for partial summary judgment.

Plaintiffs' additional argument, that there was no consideration given for their promise not to use the present theories, must also be rejected. Plaintiffs received the payment provided for in § 2.1 of the Settlement Agreement. In their reply brief, however, plaintiffs intimate that separate consideration was required for the particular promises regarding the Excepted Claims, i.e. that each promise contained in a contract must be supported by separate consideration. This is not the law. The Restatement (Second) of Contracts § 80 states:

> (1) There is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone. (2) The fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration.

Restatement (Second) of Contracts § 80 (1981); *see also Chicago Litho Plate Graining Co., Ltd. v. Allstate Can Co.*, 838 F.2d 927, 931 (7th Cir.1988). A comment to § 80 explains, "Since consideration is not required to be adequate in value (see § 79), two or more promises may be binding even though made for the price of one." Restatement (Second) of Contracts § 80 cmt. a (1981). The $13,162,931 sum provided for in § 2.1 of the Settlement Agreement supports all of the promises plaintiffs made in the Settlement Agreement. When payment was made, the accord represented by the Settlement Agreement was satisfied. Consequently, the first four theories of recovery presented in plaintiffs' motion for partial summary judgment are barred by the doctrine of accord and satisfaction. Plaintiffs cannot raise theories of recovery that rely upon an allegation that the FDIC breached the Assistance Agreement entered into by plaintiffs and the FSLIC.[19]

In any event, permitting defendant to present this defense and sustaining it works no prejudice to plaintiffs. Were the court to allow plaintiffs to assert these first four theories, the theories would be rejected on their merits. The first three of the four theories, which ask the court to find a meeting of the

---

19. Having reached this holding, the court does not intend to foreclose other theories of liability plaintiffs may be able to develop that would entitle them to recovery of the additional reimbursement amount. The court's holding today is limited to a finding that the Settlement Agreement bars theories of recovery that allege a breach of contract by the FDIC; the continuing viability of other theories of recovery will be determined as needed.

minds regarding the effect of non-availability of the covered asset loss deduction on covered asset loss reimbursement, fail because of the absence of such an agreement. Failure to provide full reimbursement can only be a breach of the Assistance Agreement if the Assistance Agreement contained a promise by the FSLIC to provide full reimbursement in the event of non-availability of the deduction. Only two of the seventy-seven paragraphs contained in plaintiffs' revised proposed findings of fact in support of their motion for partial summary judgment specifically address the effect of the non-availability of the covered asset loss deduction on reimbursement payments. *See* Rev. Prop. Findings Uncont. Fact Supp. Pls.' Mot. ¶¶ 57, 58.

Paragraph 57 of plaintiffs' revised proposed findings of fact concerns a 1990 memorandum written by Richard P. Hodge, an accountant who represented the acquiring institutions during negotiation of the Assistance Agreement in question here. That memorandum, in pertinent part, states,

> [The acquirers are] only reimbursed for ninety percent of any covered asset loss. This is because [the acquirers are] paid the "After–Tax Amount" for any loss. The "After–Tax Amount" (10%) was to reimburse the FDIC for the benefit of the federal income tax loss. However, since the proposed legislation would effectively disallow this loss, [the acquirers] should be reimbursed the entire amount of the covered asset loss. If the FDIC agrees, the detrimental effect of the loss disallowances to the MacAndrews and Forbes consolidated group will be reduced.

This language does not support the conclusion that, at the time the Assistance Agreement was executed, the FSLIC promised that, in the event that the covered asset loss deduction became unavailable, the FSLIC would provide full reimbursement for covered asset losses. In fact, this language supports the opposite conclusion. If, in 1988, the parties had reached an agreement that included the promise by the FSLIC claimed by plaintiffs, it would be unnecessary, in 1990, to speculate whether the FDIC agreed with their position regarding full reimbursement. The word "should," in this context,

appears to be used in a normative or moral sense, rather than as descriptive of what the Assistance Agreement actually requires.

Paragraph 58 is also of doubtful use to the plaintiffs. That paragraph involves a 1991 "Tax Profile" prepared by an FDIC tax accountant, Bobby Ray Bean. The relevant language in the Tax Profile provides an example of how reimbursement operates with the covered asset loss deduction *versus* how reimbursement operates without the covered asset loss deduction. Defendant alleges that this Tax Profile was written as part of a strategy for renegotiation of the Assistance Agreement and, as such, the language utilized by plaintiffs is not descriptive of the Assistance Agreement as written but rather reflects a potential negotiating point in the renegotiation of the Assistance Agreement. Def.'s Rev. Statement Genuine Issues ¶ 52. Mr. Bean has even denied believing, at the time he wrote the Tax Profile, that plaintiffs were entitled to full reimbursement in the event of non-availability of the deduction. Suppl. Appendix Vol. III—Pls.' Mot. 130 at 104. Assuming the position taken by Mr. Bean on this question in 1991 is material to the discussion at hand, this conflicting testimony, at the very least, sets up a genuine issue of material fact.

The rest of plaintiffs' evidence indicates at most that there was an assumption made by both parties that the deduction existed and that the formula for calculating the After–Tax Amount reflects the sharing of the available benefits derived from that deduction. *See* Rev. Prop. Findings Uncont. Fact Supp. Pls.' Mot. ¶¶ 1–56. However, the fact that the parties to the Assistance Agreement based the After–Tax Amount formula on the availability of a certain tax deduction and, through that formula, shared the benefits of that deduction does not, of necessity, mean that the FSLIC promised to provide full reimbursement if that deduction became unavailable. Indeed, plaintiffs stress that the effect of non-availability of the deduction on reimbursement payments was not even discussed during negotiation of the Assistance Agreement. *Id.* at ¶ 35. Consequently, to agree with plaintiffs on this point would require us to find that the FSLIC, at the time

of contracting, made a promise through silence to provide full reimbursement in the event of non-availability of the deduction. In light of the extensive negotiations carried on between plaintiffs and the FSLIC regarding reimbursement for covered asset losses and the After–Tax Amount formula, *see id.* at ¶¶ 30–38, inferring such a promise from silence is unwarranted.

The court would also reject the fourth of plaintiffs' first four theories on its merits. In the absence of an agreement to provide full reimbursement in the event of non-availability of the covered asset loss deduction, plaintiffs ask the court to imply a term providing for such reimbursement. Restatement (Second) of Contracts § 204 provides, "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1981). Here, no essential term is missing. As the court in *Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 608 (7th Cir. 1993) (citations omitted), stated when considering the admissibility of extrinsic evidence to guide the court in implying a term,

> Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense, there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them. If therefore the collective bargaining agreements in this case were completely silent on the duration of health benefits for retired employees, then since . . . nothing in the structure of the agreements required that the duration be perpetual, we would not allow extrinsic evidence to show that those employees have a perpetual entitlement.

There is no "yawning void" in the Assistance Agreement under consideration here. As in the hypothetical considered in *Bidlack,* the Assistance Agreement is completely silent regarding the effect of non-availability of the covered asset loss deduction on reimbursement for covered asset losses. Nothing in the structure of the agreement indicates that full reimbursement would be provided in the event of non-deductibility of covered asset losses; the Assistance Agreement is "plausibly complete" without such a term. Therefore, the court would refuse to imply a term providing for such reimbursement were it necessary to reach the merits of plaintiffs' fourth initial theory.

### 2. Plaintiffs' Fifth Theory

The remaining theory of plaintiffs' motion for partial summary judgment is that enactment of the Guarini legislation constituted a breach of the implied obligation of good faith and fair dealing under the Assistance Agreement; therefore, as a result of that breach, the FDIC is not entitled to retain ten percent of the full reimbursement amount. This claim is "against the United States of America for breach of contract or constitutional taking by reason of the enactment" of the Guarini legislation. The breach alleged is the enactment of the Guarini legislation itself. The claim thus is not "based" on any acts or omissions of the FDIC or RTC, and is, therefore, not barred by the Settlement Agreement.

At oral argument, plaintiffs' counsel compared plaintiffs' ability to take a deduction for covered asset losses to a hunting license and stated that plaintiffs had paid a premium price for that license. He argued that the availability or non-availability of the deduction in 1988 was irrelevant to the question of whether Congress impermissibly revoked that license through enactment of the Guarini legislation. Targeted enactment of that legislation was thus a *per se* violation of an implied covenant of good faith and fair dealing.

The court does not agree that the question of whether the tax deduction for covered asset losses was actually permitted by the law in 1988 is irrelevant to an argument alleging breach of the covenant of good faith and fair dealing. The implied obligation of good faith and fair dealing is tied to the parties' rights, obligations, and expectations under the contract. Plaintiffs would not be

entitled to exemplary damages if it turns out that the deduction was never legally available. As to this theory, plaintiffs must show that the tax deduction at issue was actually available in 1988 to obtain relief on their claim of breach of the implied covenant of good faith and fair dealing. They have not done this.

### 3. Theory Presented in Plaintiffs' Supplemental Brief

■ As noted previously, plaintiffs asserted a new theory of recovery in their supplemental brief. This theory does not allege a duty of the FDIC to provide full reimbursement; rather, it alleges a duty of the plaintiffs "to make tax benefit payments pursuant to the 10 percent reductions in covered asset loss reimbursements." Pls. Suppl. Br. at 4. Plaintiffs claim that enactment of the Guarini legislation eliminated this duty.[20] Consequently, enactment of the Guarini legislation was a condition subsequent that discharged plaintiffs' duty to make tax benefit payments; the theory does not allege that enactment of the legislation was a breach of contract.

Because this new theory does not allege a breach of contract or constitutional taking "by reason of the enactment" of the Guarini legislation, this theory, like the first four initial theories, is not an Excepted Claim. However, unlike the first four initial theories, this new theory does not allege a breach of contract by the FDIC. Instead, it turns wholly on interpreting the Assistance Agreement to include a promise by plaintiffs to share tax benefits that is discharged by elimination of the deduction for covered asset losses. Because this new theory is not an Excepted Claim, it may be barred by the Settlement Agreement even if it is not based on "any acts or omissions of the FDIC." However, because we reject the argument on its merits, we do not reach this question.

In § 6(a)(2) of the Assistance Agreement, the FSLIC explicitly promised to make reim-

bursement payments to plaintiffs for covered asset losses. The FSLIC undertook a duty to make payments to plaintiffs, not *vice versa*. Plaintiffs' new theory does not correspond to the reality of the Assistance Agreement. Instead, it reflects an effort to avoid alleging that the FDIC is in breach. The effort fails, however. In the absence of a promise by plaintiffs to make tax benefit payments, there is no duty to which plaintiffs' proposed condition, enactment of the Guarini legislation, can attach. Once the parties put in place the contractual formula for reimbursement, there was nothing further for plaintiffs to do or not do. The court, therefore, rejects the new theory set forth in plaintiffs' supplemental brief.

### CONCLUSION

Defendant's motion for leave to file an amended answer is granted. Plaintiffs' motion for partial summary judgment is denied. Plaintiffs are limited to theories consistent with this opinion. Defendant's cross-motion for partial summary judgment is granted to the extent that the first four theories of recovery presented in plaintiffs' motion are barred. Defendant's cross-motion for partial summary judgment is otherwise denied. Because defendant's counsel stated at oral argument that the government had deposed all of the people named in defendant's RCFC 56(g) request, Tr. at 65, defendant's RCFC 56(g) request for discovery is denied as moot. Because this opinion does not rely on the testimony plaintiffs seek to strike, plaintiffs' motion to strike that testimony is denied as moot. Defendant's motion for leave to file reply to plaintiffs' supplemental brief is granted.

The parties shall submit a joint status report on January 8, 2001, advising the court of proposed further proceedings in the case.

---

20. Plaintiffs couch their argument in terms of the "failure" of the condition of deductibility. However, the failure of a condition, pursuant to the Restatement section cited by plaintiffs, signifies that a duty has not yet arisen. Here, plaintiffs argue that a pre-existing duty on their part was discharged. Therefore, plaintiffs' argument is that enactment of the Guarini legislation was a condition subsequent that terminated their duty to make tax benefit payments. *See* Restatement (Second) of Contracts § 230.